STATE

v.

Ronald QUARLES.

85–87–C.A.

Supreme Court of Rhode Island.

February 7, 1986

Arlene Violet, Atty. Gen., Constance L. Messore, Thomas Dickinson, Special Asst. Attys. Gen., for defendant.

William F. Reilly, Public Defender Barbara Hurst, Paula Rosin, Asst. Public Defenders, Providence, for plaintiff.

**OPINION**

KELLEHER, Justice.

Ronald Quarles (Quarles), indicted for murder in the second degree, was convicted by a Providence County[1] jury of manslaughter in the slaying of Lorraine Pinto (Pinto), his cohabitant. After his postverdict motion for a new trial was denied, a fourteen-year sentence was imposed. On appeal Quarles claims that the trial justice committed prejudicial error in refusing to instruct the jury that he was not obligated to retreat before resorting to the use of deadly force in his own defense.

Quarles's version of what happened on the evening of October 4, 1983, follows. After eating dinner at home with Pinto, Quarles went to a union meeting, planning to meet Pinto at a local barroom after the meeting ended. Upon entering the bar, Quarles saw Pinto talking with a man he did not recognize. At first he felt angry because he thought Pinto was "trying to sneak around behind my back" with another man, but his anger quickly subsided. As the night wore on, Quarles and Pinto drank and shot some pool. Several arguments erupted over Pinto's refusals to go home with Quarles; finally he walked back to their common residence in Newport. About ten minutes later Pinto walked into the house and informed Quarles that he had one week to find another place to live. Quarles agreed to leave in a week and went upstairs to their bedroom and began to undress. Pinto followed him upstairs and started to choke him. He punched her in order to get her to release him. Infuriated, she told him to get out "tonight." Quarles called her a "tramp" and indicated that he would not put up with her antics any longer. Pinto went downstairs into the kitchen. After Quarles dressed, he followed her downstairs. When he entered the kitchen, Pinto swung a nine-inch kitchen knife at him. He stepped back and wrestled the knife out of her hands. Quarles conceded that at this point he could have left the

---

G.L. 1956 (1981 Reenactment) § 12–3–4, as amended by P.L. 1981, ch. 104, § 1.

house with the knife under his control. But Pinto suddenly grabbed his arm and struggled with him in an attempt to regain control over the knife. During the ensuing affray, in the early morning hours of October 5, Pinto was fatally stabbed by Quarles. Quarles claims that the stabbing occurred when Pinto grabbed his arm and drew the knife toward herself. When he withdrew the knife and saw blood on it, he realized that there had been a stabbing. He insists that Pinto's wound was self-inflicted.

The trial justice instructed the jury on second-degree murder, on manslaughter, and on the defense theories of accident and self-defense. His instruction on the issue of self-defense follows:

"[A] person who reasonably believes that he's in imminent danger of harm at the hands of another may defend himself. He does not have to wait for the first blow to land. However, if such person strikes first, he may only use such force as is reasonably necessary for his own protection. The permissible degree of force used in self-defense depends on that which is necessary under all the circumstances to prevent an impending injury.

"In a case such as this it is the burden of the State to prove beyond a reasonable doubt that the defendant was not acting in self-defense. If it is not proved, this element, beyond a reasonable doubt, then you must find the defendant not guilty.

"The test of whether or not the defendant acted in self-defense is not whether the fact finder, you, the jury, believe the force used was necessary, but whether the defendant, under the circumstances he experienced at the time in question, reasonably believed that the force used by him was necessary to prevent eminent harm."

The trial justice refused to instruct the jury that Quarles was not obligated to attempt retreat prior to resorting to the use of deadly force.[2] Quarles objected to the omission of his requested instruction and now contends that the failure to instruct the jury in accordance with his request was reversible error requiring a new trial. We disagree.

■■■ The law concerning self-defense in Rhode Island permits persons who believe that they are in imminent peril of bodily harm to use such nondeadly force as is reasonably necessary in the circumstances to protect themselves. *State v. Tribble,* —, R.I. —, —, 428 A.2d 1079, 1082 (1981) (citing *Martin v. Estrella,* 107 R.I. 247, 253, 266 A.2d 41, 46 (1970) ). Before resorting to the use of deadly force, the person attacked must attempt retreat if he or she is consciously aware of an open, safe, and available avenue of escape. *State v. Guillemet,* — R.I. —, —, 430 A.2d 1066, 1069 (1981). The only exception in Rhode Island to the obligation to attempt retreat was created by statute. It exempts an individual from the duty to retreat and permits the use of deadly force by an owner, tenant, or occupier of premises against any person engaged in the commission of an unlawful breaking and entering or burglary. General Laws 1956 (1981 Reenactment) § 11–8–8.

Quarles attempts to persuade us to create a new exception to the retreat requirement by adopting the common-law castle doctrine. He asserts that this "universally recognized" doctrine exempts the person assailed from the obligation of attempting retreat when the attack occurs in the de-

---

**2.** The defendant submitted the following instruction concerning this issue:
"REQUEST NO. 31
  If the defendant had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he is not required to re-treat or to consider whether he can retreat safely. He was entitled to stand his ground and use such force as was reasonably necessary under the circumstances to save his life or protect himself from serious bodily harm. *Beard v. United States,* 158 U.S. 550, 563, 15 S.Ct. 962, 967 [39 L.Ed. 1086] (1895)."

fendant's dwelling. Quarles contends that the castle doctrine, which embodies the notion that a person's authority is paramount in his own home and need not be compromised in the face of an unlawful attack, should be adhered to even when, as in the instant case, the assailant is a cohabitant.

■ We have grave doubts that Quarles's reliance on the theory of selfdefense was relevant once he had wrested the deadly weapon from his assailant, especially since he insists the wound inflicted was accidental. However, because the issue of retreat that Quarles attempted to raise is one that will undoubtedly be raised again, we believe that we should make our position clear. We are of the opinion that a person assailed in his or her own residence by a co-occupant is not entitled under the guise of self-defense to employ deadly force and kill his or her assailant. The person attacked is obligated to attempt retreat if he or she is aware of a safe and available avenue of retreat.

In *State v. Guillemet,* —— R.I. at ——, 430 A.2d at 1069 n.2, we noted that a majority of jurisdictions have recognized an exception to the requirement of retreat when the attack occurs in the occupant's home. This exception prevails without regard to whether the assailant's status is that of an intruder or a co-occupant. *Id.*

However, several jurisdictions that have adopted the castle doctrine have held that it has no application to cases between two persons entitled to occupy the same dwelling. *See State v. Shaw,* 185 Conn. 372, 381, 441 A.2d 561, 565 (1981).

In *Commonwealth v. Shaffer,* 367 Mass. 508, 326 N.E.2d 880 (1975), the defendant, convicted of manslaughter in the shooting of her cohabitant, claimed the trial justice erred in failing to instruct the jury that she was not obligated to attempt retreat from her assailant in her own home. The Supreme Judicial Court dismissed her appeal and adhered to its "long-established rule

that the right to use deadly force by way of self-defense is not available to one threatened until he has availed himself of all reasonable and proper means in the circumstances to avoid combat \* \* \*." [3] *Id.* at 511, 326 N.E.2d at 883.

We find the rationale of *Shaffer* persuasive in that it affords due recognition to the value of human life while recognizing that the right of self-defense is born of necessity and should terminate when the necessity is no more. Consequently, we are of the belief that even in the so-called co-occupant situation, no justification exists for departing from our long-established rule that when a person

"is attacked by another under such circumstances as to lead him to apprehend peril to his life, or great bodily harm, he may kill his assailant, *provided* he cannot otherwise protect himself, as by retreating from danger, by warding off the attack by a weapon not deadly, by disabling his adversary without killing him, or in any other way preserving his own life and person \* \* \*." (Emphasis added.) *State v. Ballou,* 20 R.I. 607, 610–11, 40 A. 861, 863 (1898).

Thus, the obligation to attempt retreat exists where one is assaulted in his or her own living quarters by his or her co-occupant. Therefore, the trial justice did not err in refusing to instruct the jury in the manner requested by Quarles.

Accordingly, Quarles's appeal is denied and dismissed, and the judgment appealed from is affirmed.

■■■■■

---

**3.** We are aware that the Massachusetts Legislature altered the holding in *Shaffer* as it applies to unlawful intruders. *See* Mass. Gen. Laws Ann. ch. 278, § 8A, as enacted by 1981 Mass. Acts ch. 696.