STATE

v.

**Donna ORDWAY.**

No. 91–232–C.A.

Supreme Court of Rhode Island.

Dec. 17, 1992.

James E. O'Neil, Atty. Gen., Aaron Weisman, Jeffrey Greer, Asst. Attys. Gen., for plaintiff.

John Cicilline, Providence, for defendant.

## OPINION

FAY, Chief Justice.

This matter is before the Supreme Court on appeal by the defendant, Donna Ordway, from a Superior Court conviction of manslaughter. The defendant appeals her conviction on numerous grounds. The defendant claims that the trial justice committed error (1) by allowing Dr. Debra Kaiser to testify on the subject of battered women's syndrome, (2) by improperly instructing the jury on the doctrine of retreat, (3) by denying the defendant's request to instruct the jury on the difference between the developmental skills of men and those of women, (4) by denying the defendant's motion for a mistrial, and (5) by improperly

instructing the jury on the definition of manslaughter.

On February 7, 1987, patrolman Bryan Merchant (Merchant) of the Glocester police department responded to a telephone call from defendant's home. He found defendant in the kitchen, screaming hysterically that she had stabbed her husband, who was in another room. Merchant entered the living room and found David Ordway (Ordway) lying face up in a pool of blood. Merchant checked Ordway's pulse and determined that he was still alive. He then called the police dispatcher and told the dispatcher to advise the rescue team to get to the house as quickly as possible. Merchant then read defendant her rights and advised her that she was a suspect in a crime of assault with a dangerous weapon. The defendant was yelling and swearing at Merchant and advised him that she "did not give a * * *" about her rights because she had stabbed her husband in self-defense.

The defendant informed Merchant that she and Ordway had had an argument that turned into a fight and that in order to protect herself, she stabbed Ordway. The defendant declared that she was sick of the way Ordway treated her. Merchant then asked defendant what she had done with the weapon. The defendant told Merchant she had put the knife in the kitchen sink.

Patrolman David LaPlante (LaPlante) and Sergeant Jamie Hainsworth (Hainsworth) arrived at the scene. After reporting to Hainsworth, Merchant was ordered to follow the rescue team to Fogarty Hospital.[1] Ordway was pronounced dead approximately fifteen minutes after arriving at the hospital. Hainsworth and LaPlante transported defendant to the Glocester police station. At the police station defendant was advised that she was being charged with the murder of her husband, David Ordway. The defendant then became violent and started screaming. Police personnel had to restrain her physically and hold her down. Hainsworth instructed a patrolman to take defendant to Rhode Island Hospital because she would not calm

---

1. Fogarty Hospital is now known as Landmark Medical Center.

down. The patrolman testified that upon arrival at the hospital defendant informed a hospital employee that she was a murderer and had killed her husband.

On February 8, 1987, Dr. Maryann Clayton, a forensic pathologist in the Medical Examiners' office, performed an autopsy on Ordway. Doctor Clayton located two stab wounds, one to the left side of the chest and the other to the left arm. The stab wound to the left side of the chest lacerated the left lung and the left side of the heart. Doctor Clayton testified that the cause of death was the stab wounds and the manner of death was homicide.

John Bazinet (Bazinet), James Switzer (Switzer), and David Santos (Santos) testified regarding the events of the evening of February 7, 1987. Santos had been Ordway's nephew whereas Bazinet and Switzer were acquaintances of the Ordways. According to their testimony, on the evening of February 7, Switzer, Santos, and the Ordways were at a party at Bazinet's house. Both defendant and Ordway were drinking. At some point in the evening David Carter (Carter) arrived at the party with a puppy. When defendant asked Carter if she could have the puppy, he informed her that she could not. The defendant repeatedly asked if she could have the puppy, and Ordway told her that she could not. The defendant began "nagging" Ordway and became "moody and upset." At approximately 8:30 in the evening the party moved to the Ordway house. The defendant and Ordway continued arguing about the puppy. The argument continued for approximately one-half hour, and then Ordway left the house. Switzer testified that Ordway was "disgusted and embarrassed" because his friends were witnessing the argument between Ordway and defendant. Approximately twenty minutes later Ordway returned to the house. As Ordway entered the house, the last of the guests were leaving. Ordway requested that they stay at his house, but they refused. Bazinet testified that Ordway seemed calm at this point in the evening.

At the trial defendant testified to the following: from the ages of six to nineteen she was transferred from one care facility to the next; she became pregnant at the age of sixteen and at the age of nineteen had another child that she gave up for adoption. At the age of twenty defendant, along with her first child, moved into an apartment in East Providence. Ordway, a divorcee with two children, lived next door to defendant. By the time defendant started dating Ordway, she had had her third child. After approximately six weeks of dating, Ordway moved in with defendant.

The defendant testified that two months after Ordway moved in with her, the relationship became abusive and Ordway would beat her as often as once a week. The defendant described a "typical beating" as including backhands, punches, and kicks to her head, ribs, and legs. She stated that when Ordway hit her, he would yell that she was "not a woman" and she was "not good in bed." On a number of occasions the beatings resulted in defendant's seeking medical attention. On one occasion she had her ribs broken. She testified that most of the beatings took place when Ordway was drinking.

After living together for a year and a half, defendant married Ordway. The defendant stated that she had loved Ordway and she had believed that "things would change" after they were married. The frequency of the beatings increased after the marriage and occurred as often as three times a week. At the end of the beatings Ordway would order defendant to lie on the floor and threaten to kill her if she attempted to stand. If defendant said anything or tried to get up from the floor, the beating would continue. Ordway threatened to kill her if she cried.

The defendant reported Ordway to the police on two occasions and did not report the other beatings because she was afraid of what Ordway would do to her. Ordway was formally charged with assault on two separate occasions. Ordway plead nolo contendere to one charge and received a three-month suspended sentence. The defendant dropped the other charge because Ordway promised her he would attend counseling sessions. At one point defen-

dant obtained a restraining order against Ordway, but it was later dismissed because defendant reconciled with Ordway. The defendant testified that she did not leave Ordway because she loved him, that she did not have any money to support herself and her children, and that she had no other place to go.

The defendant testified that in the two months prior to February 7, 1987, the frequency of the abuse escalated. Ordway would then beat her into a corner and order her to stay there. When Ordway did not like what defendant had cooked, he would either throw it at her, hit her in the head, or mash the food into her face. He refused to allow her to see her friends and only allowed her to spend money on household items.

Early on the evening of February 7, 1987, defendant met Ordway at Bazinet's residence. The defendant testified that she was at Bazinet's residence for approximately two hours whereupon the party relocated to the Ordway home. The defendant testified that two men with a puppy arrived at the Ordway home. She did not remember seeing the two men at Bazinet's house. She asked the man with the puppy if she could have it. She stated he was going to give the puppy to her but did not.

Carter testified that it was he who arrived at Bazinet's house with the puppy. Carter stated that he was going to give the puppy to defendant but did not when he was told by Bazinet that Ordway would probably kill the puppy or bring it to the dog pound. Carter testified that Ordway and defendant argued about the puppy at the Ordway home.

The defendant indicated that at some point in the evening Ordway left the residence. The defendant testified that Ordway "looked mad" but that she did not know why Ordway was angry. After Ordway left the party, Carter asked defendant if he could take her to a safer place. The defendant replied that she could not leave because "he [Ordway] would kill me." Carter testified that when he left the party, defendant "looked terrified." When Ordway returned to the party, the guests had

left and defendant was in the kitchen ending a phone conversation. The defendant placed a telephone call to her mother in New Jersey because she was afraid Ordway was going to hurt her and "needed someone to talk to." The defendant testified that Ordway then stated, "[w]hat are you doing, telling her [defendant's mother] our business?" Ordway then started slapping defendant. He began punching and kicking defendant as he threw beer on her and pulled her by the hair into the living room. He dragged defendant to the front of the television set and told her that if she moved, he would kill her.

The defendant stayed on the floor for a few minutes, and then as defendant was trying to stand up, Ordway started walking toward her and stated, "I thought I told you not to get up." The defendant testified that Ordway came at her with outstretched hands and an "enraged, blank look in his eyes."

The defendant thought that Ordway was going to choke her, and as he approached her, she told him to stay away. On previous occasions Ordway had choked defendant until she had lost consciousness. Ordway did not say anything as he approached defendant. A knife had been left on the television set by Ordway when he had tried to connect a videocassette recorder to a stereo. The defendant grabbed the knife from the television and warned Ordway to stay away from her. When Ordway continued to approach defendant, she stabbed him in the arm. Ordway then fell to the floor. The defendant dropped the knife and cautiously approached Ordway because she believed he was faking. When defendant saw blood, she ran into the kitchen, threw the knife into soapy water, and then called the rescue team. She then went back into the living room and hugged and kissed Ordway.

The defendant remembered stabbing Ordway only once. She asserted that her initial intention as she rose off the floor was to try to get away from Ordway and to the front door. It was while she was at the Glocester police station that defendant first learned that she had killed her husband.

Upon learning this gruesome fact, defendant became hysterical. The defendant was subsequently found guilty of manslaughter and was sentenced to fifteen years in prison with five years to serve.

### I

The defendant contends that the trial justice erred in allowing Dr. Debra Kaiser to testify on the subject of battered women's syndrome. Doctor Kaiser is a clinical psychologist who maintains a private practice while also working in the Office of Mental Health for the State of New York. Doctor Kaiser is a specialist in victim psychology with a concentration in battered women and rape victims. Doctor Kaiser testified that she has treated "well over 100 battered women." She has been qualified as an expert in over 180 different court cases and has been allowed to give expert testimony in the area of battered women's syndrome on twenty occasions. The record is replete with Dr. Kaiser's qualifications in the area of battered women's syndrome. In fact, this court, in *McMaugh v. State*, 612 A.2d 725, 729 (R.I. 1992), determined that "Doctor Kaiser has been widely considered an expert in the field of battered women."

■ It is well settled that the question of whether a witness may give expert testimony on a particular subject is within the sound discretion of the trial justice and will not be disturbed unless there is an abuse of that discretion. The trial justice must determine that the testimony is relevant and will be helpful to the jury. *State v. Correia*, 600 A.2d 279 (R.I.1991). Our law ensures that a witness qualified as an expert in a particular field will aid the jury in understanding complex issues; it does not guarantee that an expert will concur with opposing counsel's theories. We find that the trial justice did not abuse his discretion in qualifying Dr. Kaiser as an expert.

### II

The defendant maintains that the trial justice's instructions to the jury outlining the doctrine of retreat were improper. The trial justice instructed the jury on defendant's right to use self-defense and the doctrine of retreat as follows:

"If the defendant used deadly force to repel an alleged attack by the victim, then you should consider what is known in the law as the doctrine of retreat * * *. The doctrine of retreat requires that, before resorting to the use of deadly force, the person who was allegedly attacked must first withdraw or attempt to retreat if that person is consciously aware of an open, safe and available avenue of escape. In other words, the right to use deadly force, by way of self-defense is not available to the person threatened until he or she has availed himself of all reasonable and proper means which were then known and available to that person in order to avoid the combative confrontation."

The trial justice's instruction was based on this court's holding in *State v. Quarles*, 504 A.2d 473 (R.I.1986), which also stated:

"The only exception in Rhode Island to the obligation to attempt retreat was created by statute. It exempts an individual from the duty to retreat and permits the use of deadly force by an owner, tenant, or occupier of premises against any person engaged in the commission of an unlawful breaking and entering or burglary. General Laws 1956 (1981 Reenactment) § 11-8-8." 504 A.2d at 475.

■ The defendant objected to the trial justice's instruction, claiming that this court should extend the one exception to the doctrine of retreat to include the well-accepted castle doctrine. The castle doctrine embodies the notion that an individual holds paramount importance in his own home and need not compromise that importance in the face of an unlawful attack even when, as in the case at hand, the assailant is a cohabitant of the premises. In *State v. Quarles* this court was clear in rejecting the castle doctrine, and we have no intention of contradicting that ruling today. As we stated in *Quarles:*

"We are of the opinion that a person assailed in his or her own residence by a co-occupant is not entitled under the

guise of self-defense to employ deadly force and kill his or her assailant. The person attacked is obligated to attempt retreat if he or she is aware of a safe available avenue of retreat." *Id.* at 476. Subsequent to *Quarles,* this court has clarified the application of the doctrine of retreat and its exceptions. In *State v. Fetzik,* 577 A.2d 990 (R.I.1990), this court held that an occupant of a dwelling, when attacked in his or her home by a trespasser, does not have a duty to retreat and may use deadly force if necessary to avoid death or great bodily harm. In *State v. Walton,* 615 A.2d 469 (R.I.1992), this court held that a person attacked in his or her dwelling by a person who initially entered as a social guest but who became a trespasser by remaining on the property after being ordered to leave, is absolved from the duty to retreat. "We have definitely held that one is not absolved from the duty of retreat if attacked by a cotenant or cohabitant, *Quarles.*" *Id.* at 472.

Thus, the obligation to attempt retreat exists even when one is assaulted in his or her own living quarters by his or her co-occupant. Therefore, we find that the trial justice did not err by instructing the jury on the doctrine of retreat.

### III

■ The defendant contends that the trial justice erred in refusing to instruct the jury concerning the difference between the developmental skills of men and of women. The defendant maintains that women do not mature in an atmosphere where they are taught to box, wrestle, or learn the most rudimentary skills of self-defense. The defendant asserts that because of this environmental effect, she should not be subjected to the reasonable-man standard in evaluating her belief that it was necessary to use deadly force to protect herself from her husband's actions on the evening of February 7, 1987. The trial justice instructed the jury as follows:

"In your considering as to whether or not Donna Ordway's actions were justified, you must determine whether she had reasonable grounds to believe, and

actually did believe, that she was in imminent danger of death or serious bodily harm. The test is not the actuality of impending harm, nor the actual amount of force needed to prevent it. Rather, it is the reasonable belief of this defendant which is controlling in both respects. In making that determination, the totality of the circumstances under which this defendant acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable believe [*sic*] that David Ordway was then about to kill her or to do her serious bodily injury. In addition, the defendant must have actually believed that she was in imminent danger of death or great bodily harm."

We determine that these instructions are abundantly clear and adequate in the circumstances. The trial justice properly denied defendant's request for the proposed instruction.

### IV

The defendant contends that the trial justice erred in denying defendant's motion for a new trial. The defendant argues that a question put to her by the prosecutor was inherently prejudicial to her right to a fair and impartial trial and that its destructive impact was not cured by the cautionary instructions given to the jury by the trial justice. The following colloquy occurred between the prosecutor and defendant when the prosecutor was cross-examining defendant about her abusive relationships prior to her relationship with Ordway:

"THE STATE: Okay. All right, what type of arguments did you get into with Mr. DaRosa?

"THE DEFENDANT: That he wasn't working and he wasn't bringing any money in.

"THE STATE: And your husband wasn't working, was he?

"THE DEFENDANT: No. He was bringing—he was on Worker's Comp., though.

"THE STATE: But Mr. DaRosa hit you?

"THE DEFENDANT: Yes.

"THE STATE: Do you remember that?

"THE DEFENDANT: Yes.

"THE STATE: And did he hit you often?

"THE DEFENDANT: No.

"THE STATE: Not too often?

"THE DEFENDANT: No.

"THE STATE: And you loved Mr. DaRosa?

"THE DEFENDANT: Yes.

"THE STATE: As a matter of fact, was there a period of time where you lived with Mr. DaRosa in East Providence and David Ordway was a neighbor?

"THE DEFENDANT: Yes.

"THE STATE: *Do you recall having stabbed Mr. DaRosa?*" (Emphasis added.)

Defense counsel immediately objected and moved for a mistrial. The trial justice sustained the objection, and the question was stricken. The trial justice recessed the proceedings for the weekend and then at sidebar voiced his shock at the question posed by the state.

"THE COURT: You know, it took us a week to get a jury in the box. I was a prosecutor for ten years. Never, ever have I seen a question so fraught with an explosiveness such as the one you just asked which is based on such flimsiness. * * * I am absolutely livid."

At sidebar the prosecutor explained to the trial justice that Ordway's ex-wife, Margaret Richmond, indicated to the state that at the time she and Ordway lived next door to defendant and William DaRosa (DaRosa), she recalled having seen DaRosa run out of the house, exclaiming that defendant had stabbed him. The court inquired if the state had made any attempt to confirm the incident with DaRosa. The state informed the court that DaRosa had refused to talk to an investigator and did not confirm the hearsay statement of Ordway's ex-wife.

The state informed the trial justice that it had considered calling DaRosa as a rebuttal witness. The trial justice was neither impressed with nor convinced by the state's contention.

"THE COURT: A witness who was not cooperative with you in the first place, a witness who in no way confirmed what Margaret Richmond [Ordway's ex-wife] told you, you thought you'd take a shot in the dark to see what Mrs. Ordway might say with respect to this question?"

When the trial reconvened on the following Monday, four days after the challenged question was posed, the trial justice privately inquired of each individual juror whether the stricken question posed by the prosecutor affected his or her fair and impartial consideration of the case. The trial justice questioned one juror as follows:

"THE COURT: Now, I want you to answer this question for me: You recall when we were last in court last Thursday, Mr. Craven asked Mrs. Ordway a question something to the effect that did she recall having stabbed a former boyfriend. At that time Mr. Cicilline objected to the question and I sustained the [objection]. At that time, I said that the question was stricken from the record, and it was not to be given any thought whatsoever by the jurors, and I have ruled that it was an impermissible question, legally, and without factual basis upon which to ask it; and I told you at the beginning of the trial that there would come times, perhaps when I would ask you to strike things from your mind and not consider things and basically disregard things. This is one of those instances, and I want to be sure that you can do that and you are in no way affected by the question which I've ruled has no basis of fact or law anyway. You tell me.

"JUROR: Yes, when you stated that, I kind of like put my mind in another trance at that point.

"THE COURT: This has no bearing on your thoughts?

"JUROR: No it does not."

The trial justice questioned each and every juror in this manner, explained to each of them that the question had no factual basis, and received from them their assurances that they could disregard the question and would not consider it during their

deliberations. At the conclusion of the trial justice's questioning of the jurors, one juror was excused at defense counsel's request. The trial justice was satisfied that the cautionary instructions and the individual examinations confirmed that the jurors could still remain fair and impartial in light of the question posed by the state and denied defendant's motion for a mistrial.

"We must, therefore, determine whether the prosecutor's remarks 'so poisoned the well' that the trial's outcome was likely affected." *United States v. Mateos–Sanchez*, 864 F.2d 232, 240–41 (1st Cir.1988). This court must answer the question that has bedeviled trial justices, attorneys, and academics for some time, can one "unring the bell" once it has soundly rung?

It is impossible to re-create the environment in which the question was posed. At the trial level this case was a highly publicized event. It is therefore more difficult to assess the impact the question may have had, consciously or otherwise, on a juror's decision regarding other, less important issues.

■ The right to a fair trial by an impartial jury is guaranteed by the Sixth Amendment to the United States Constitution and is applied to the states through the Fourteenth Amendment and guaranteed by article I, section 10, of the Rhode Island Constitution. This court considers "*ad hoc* the prejudicial effect of challenged remarks in light of the context in which they were uttered." *State v. Anil*, 417 A.2d 1367, 1373 (R.I.1980). This court has recognized that prejudicial comments could be the basis that could deprive a litigant of a fair trial. *State v. Plante*, 111 R.I. 386, 302 A.2d 804 (1973). It is of extreme importance to our judicial system that a jury's decision remain uninfluenced by inadmissible evidence.

It is well established that a decision on a motion to pass a case and declare a mistrial lies within the sound discretion of the trial justice. *State v. Anil*, 417 A.2d at 1372. "Determination of whether a challenged remark is harmful or prejudicial cannot be decided by any fixed rule of law. .* * * Rather, the justice must eval-

uate its probable effect on the outcome of the case by examining the remark in its factual context. * * * Prejudice clearly inheres if the challenged comments 'are totally extraneous to the issues in the case and tend to inflame and arouse the passions of the jury' against the defendant.

\* \* \* \* \* \*

[R]eversible error occurs if the allegedly improper comment was so flagrantly impermissible that even a precautionary instruction would have been insufficient to dispel the prejudice in the jurors' minds and to assure defendant a fair and impartial trial." *State v. Collazo*, 446 A.2d 1006, 1010 (R.I.1982).

■ This court is concerned with the behavior of the prosecutor. According to Rule 404(b) of the Rhode Island Rules of Evidence, evidence of other crimes, wrongs, or acts is never admissible to prove the character of the person in order to show the accused acted in conformity therewith. Once laypeople have heard evidence, or in this case a remark, tending to show that the defendant committed a crime similar to the one he or she is being tried for, their impartiality may become tainted. On appeal the state takes the position that although the prosecutor's behavior may have been questionable, the prosecutor "did not intend to do anything improper." Approximately one month before the trial began, the state received unsubstantiated hearsay evidence from the ex-wife of the victim. The state's attempt to confirm the evidence consisted of sending a police officer to DaRosa's residence early one morning, only to have DaRosa be less than cooperative. The information given to the state by Ordway's ex-wife was not substantiated by DaRosa. The record does not reflect any other "attempt" on the state's behalf to substantiate the information provided by Ordway's ex-wife. In reviewing the statement that Ordway's ex-wife gave to the Glocester police, we note that she informed police personnel that both the local police and a rescue team arrived to aid DaRosa. The record is absent any attempt to corroborate the altercation and the al-

leged injury with rescue or police personnel or anyone other than DaRosa. The state made no attempt to subpoena DaRosa albeit perhaps because the state would have been forced to accept his denial at trial. This court is not impressed with the state's one attempt to substantiate the alleged incident. There is no record of the state's even attempting to admit the statement of Ordway's ex-wife under an exception to the hearsay rule.

The trial justice astutely reminded the state that defendant should have been allowed to have the opportunity to move for a motion in limine with respect to the Rule 404(b) type material. The motion in limine:

"[Is] routinely utilized by both prosecution and defense in situations where an advance ruling is necessary to effective presentation of the case. Indeed, it is a particularly appropriate tool for the prosecution which may desire to introduce evidence without *taking the risk of a mistrial* should it turn out that the evidence is wrongfully elicited." (Emphasis added.) J. MacFayden & B. Hurst, *Rhode Island Criminal Procedure*, ch. 12 at 116–117 (1992).

The state did not advise defendant that it intended to inquire about the alleged incident. On appeal the state takes the position of a mischievous child caught with a hand in the cookie jar; it is much easier to apologize than to ask permission. In its appellate memorandum the state admits that

"[a]lthough the episode related by Margaret Richmond may not have been proper Rule 608(b) type ·evidence, and although the prosecutor should have allowed the defendant an opportunity to move for a motion in limine before cross-examining the defendant with that evidence, there is no question that the Assistant Attorney General did not intend to do anything improper by asking the question."

In this instance intent does not concern us, effect does. The state fails to realize that the cookie jar was already tipped over and shattered, the container and its contents strewn across the floor. The state never allowed defendant an opportunity for a motion in limine; it erroneously presumed that the trial would continue unharmed without the proper safeguards in place. The state was greatly remiss.

The prosecutor's questioning of defendant began with a history of her relationships with abusive men. The state carefully elicited testimony from defendant that she had been physically abused by her father and her two boyfriends before her relationship with Ordway. The state was well aware that defendant considered herself a battered woman. Battered women's syndrome is not, as yet, generally understood by the laity. Some of the jurors may have had questions why defendant did not leave the abusive relationship or attempt to defend herself against Ordway's attacks. The defendant contended that as part of battered women's syndrome, she was helpless to fight back or to leave the relationship. The question posed by the prosecutor improperly suggested to the jury that defendant was not so helpless.

We find it difficult to believe that the state was not aware of the grave consequences of posing the question. If the prosecutor believed the evidence to be relevant and important to the state's case, he should have made more than one cursory attempt to substantiate the alleged incident. If the incident had been corroborated, we wonder if the prosecutor would have then notified defendant and if a motion in limine would have resulted. In plain language this prosecutor should have realized the impact of the challenged question. The question planted the seeds of prejudice, which in this instance sprouted to an unyielding impediment to a fair and an impartial trial.

The trial justice did everything in his power to try to maintain a fair and an impartial trial. This was a high-profile case, and by the time the prosecutor asked the challenged question, many resources had already been exhausted. A trial justice's task is a difficult one, especially when judicial economy is concerned. But this court cannot ignore an unnecessary waste of resources by what is unacceptable

prosecutorial conduct. The state was on a fishing expedition, one that has become very, very costly.

 We are of the opinion that in the total context of this case the question posed by the prosecutor had the result of inflaming the passions of the jurors to the point where they were unable to pass impartially upon the issues in this case. The question was an appeal to emotion rather than to the facts of the case. The cautionary instructions and the individual examinations of the jurors by the trial justice, although commendable, did not dispel the prejudicial effect created by the question. "The naive assumption that prejudicial effects can be overcome by instructions to the jury, * * * all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790, 799 (1949) (Jackson, J. concurring). The well was poisoned and the bell rung, and the resulting effects cannot be altered.

We conclude that the instructions given by the trial justice were insufficient to negate the prejudice that flowed from the question asked by the prosecutor. The trial justice abused his discretion in failing to grant the defendant's motion to pass the case.

V

The defendant claims that the trial justice's supplementary instruction on manslaughter was improper. The defendant did not object to the trial justice's initial instruction on manslaughter, which was identical to the supplementary instruction given in response to a question from the jury. Relying on the disposition of the preceding issue and on the failure of defense counsel to object to the trial justice's initial instruction on manslaughter, we need not reach the merits of defendant's argument.

The defendant's appeal is sustained. The judgment of manslaughter is reversed, and the imposition of fifteen years' imprisonment is vacated. The case is therefore remanded to the Superior Court for a new trial.