March 24, 2026

**Supreme Court**

No. 2024-280-C.A.
(P1/22-1236AG)

State                            :

    v.                           :

Trequan Baker.              :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:    opinionanalyst@courts.ri.gov,    of    any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

State                 :

v.                :

Trequan Baker.      :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  Everyone agrees that during cross-examination of the defendant, Trequan Baker (defendant or Baker),[1] the prosecutor twice impermissibly inquired about his post-arrest decision to remain silent while in custody at the Pawtucket Police Department.  Further, the offending questions posed by the prosecutor endeavored to undermine the defendant's credibility by suggesting that his testimony—that he acted in the defense of others— had been recently manufactured as evidenced by his previous silence.  The trial justice immediately sustained the objections and, after several more questions followed by a conference at the sidebar, issued a cautionary instruction that the

---

[1] We are advised that the defendant's legal first name is Tre'Quan Baker. Nonetheless, we adopt the spelling used in the charging document.  We intend no disrespect.

defendant had the right to remain silent and that the jury may not draw an adverse inference from the exercise of that constitutional right. The question we confront is whether this limiting instruction was sufficient to cure the ensuing prejudice or whether the trial justice erred when she denied the defendant's motion for a mistrial. Despite a careful and valiant effort by the trial justice, we discern error and vacate the defendant's conviction.

**Factual Background**

In the early morning hours of January 24, 2022, defendant fatally shot Qudus Kafo (Kafo) and seriously injured Bruno Vaz (Vaz). At trial, Baker did not contest the underlying facts that he was responsible for the shooting but rather insisted that his actions were justified because he acted in the defense of others, *viz.*, his cousins. Because the defense of others doctrine focuses upon a defendant's "own reasonable perceptions as he or she comes to the aid of the apparent victim," unless stated otherwise, we recite the relevant facts from Baker's perspective. *See State v. Beeley*, 653 A.2d 722, 727 (R.I. 1995). We do so briefly, recognizing that the underlying facts are not particularly germane to the legal issue raised in this appeal.

**A**

**The Shooting and Its Aftermath**

On the evening of January 23, 2022, defendant was at home with a friend, Verrie Rose (Rose), when he received an unexpected telephone call from Derrick

- 2 -

Baker (Derrick), a cousin.[2]  The conversation was terse: Derrick and another cousin,

Koree Baker (Koree), were at a club known as the FabCity Cigar Lounge (FabCity)

in Pawtucket, Rhode Island; there had been an altercation; and Derrick feared further

trouble.  Baker perceived Derrick's voice as sounding shaky and scared; thus, when

the conversation ended, he promptly decided "[t]o go to FabCity [with Rose] and

just check on everybody, make sure they [were] okay."  The defendant grabbed a

Glock 22—a firearm he readily admitted was unlicensed—and stashed the weapon

in his waistband.  As Baker explained at trial, he did so because FabCity was known

as an establishment with a propensity for violence, and he "wanted to have [the

firearm] just in case."

Around midnight, Baker and Rose arrived at FabCity, a club renowned for

searching its patrons for weapons before allowing entry.  After a pat-down frisk

discovered nothing amiss, Baker entered the club; importantly, however, Rose and

the firearm remained in the vehicle, parked nearby.  Once inside, Derrick directed

his cousin's attention to Kafo, the person with whom he had the earlier altercation.

Baker's testimony detailed multiple interactions and observations involving

Kafo and his associates on this early morning.  For our purposes, however, it suffices

to summarize defendant's testimony as reflecting Kafo's continuous aggressive and

---

[2] Derrick Baker and his cousins share a common surname; accordingly, we refer to
the cousins by first name.  We intend no disrespect.

somewhat violent behavior toward himself (defendant), his family members, and others. The defendant also conveyed numerous instances involving Kafo (or his companions), which he interpreted as threats of violence. Contrastingly, defendant testified concerning his various efforts to deescalate the sometimes-volatile situations.

After less than an hour inside the club, Baker noticed a member of Kafo's crew depart the establishment. Aware that certain family members were already outside the venue—and recalling the prior threats of violence and his belief that Kafo and/or his compadres could be armed—defendant feared that trouble might be imminent. Baker exited FabCity, retrieved the Glock 22, and secreted the weapon in his waistband. After several minutes milling outside, Baker and others were on the verge of peacefully departing. A video recording captured the ensuing moments.

At 12:46:48 a.m., Kafo assaulted Derrick, and one second later, Derrick retaliated and swung at Kafo. Three seconds later, another Kafo colleague, Vaz, entered the fray, causing Derrick to tumble, face-first, into the ground. As Baker watched, Vaz and Kafo hovered over Derrick, punching and kicking him in the head. Others immediately joined the fracas. Two seconds later, fearing for Derrick's life, Baker shot Vaz, seriously injuring him. Seconds later, defendant testified, he witnessed Kafo lunging at a family member and motioning toward his waist. Believing that Kafo was about to shoot Derrick or Koree, Baker testified that "out

of instinct I just fired the second shot." The bullet struck Kafo, inflicting a mortal wound. The only weapon used, seen, or discovered during the melee was in defendant's possession, the Glock 22.

Notwithstanding Baker's testimony about what he had seen, he also acknowledged that the video recording contradicted his perspective at significant points. For example, despite testifying that Kafo and Vaz were kicking Derrick while he lay helpless on the ground, during trial defendant admitted that the recording did not support his prior testimony.

The defendant was found guilty of second-degree murder (count 1), discharging a firearm while in the commission of a crime of violence resulting in death (count 2), possession of a firearm without a license (count 5), and conspiracy to commit an unlawful act, *viz.*, possession of a firearm without a license (count 6). The defendant was found not guilty of assaulting Vaz with a dangerous weapon resulting in serious bodily injury and discharging a firearm while in the commission of a crime of violence resulting in permanent incapacity (counts 3 and 4). Effectively, the jury determined that when Baker shot Vaz, he acted in the defense of others, but when he shot Kafo, he was not acting in the defense of others. The trial justice sentenced defendant to serve sixty years' imprisonment (count 1) and a consecutive sentence of life imprisonment (count 2). Baker was also sentenced to

ten years' imprisonment (counts 5 and 6), to be served concurrently to the sentence imposed on count 1.  This appeal ensued.

**B**

**The Impermissible Questions**

On the seventh day of trial, defendant testified as the final witness.  As cross-examination was winding down, the prosecutor focused on defendant's January 26, 2022 post-arrest interactions with officers from the Pawtucket Police Department:

> "Q    Mr. Baker, you were arrested on January 26th of 2022, correct?
>
> "A    Yes.
>
> "Q    And you were brought to the Pawtucket Police Station, and when you're in the cellblock you initially indicate to them that you would like to speak to detectives.  Do you recall that?
>
> "A    No, I never said that.
>
> "Q    Do you recall being brought to an interview room?
>
> "A    Yes.
>
> "Q    And in the interview room, Pawtucket police provided you with a sandwich and with some water? Do you remember?
>
> "A    Yes.
>
> "Q    And they also provided you with the ability to make a confidential phone call to an attorney, correct?

"A    After I asked them, yes.

"Q    Yes. And so you asked them if you could make a phone call, they allowed you to make the phone call, and then they advised you of your constitutional rights?

"A    Correct.

"Q    Including your right to remain silent. And after that phone call, you elected, as is your right to do so, to remain silent, correct?

"A    Correct.

"Q    Fair to say that in that interaction at Pawtucket Police on January 26, you never mentioned anything to them about defending others?

"[DEFENSE COUNSEL]:    Objection.

"THE COURT:    Sustained.

"Q    In terms of what you told us this morning in this morning's session about defending others, you hadn't mentioned that previously to any members of law enforcement.

"[DEFENSE COUNSEL]:    Objection.

"THE COURT:    Sustained."

After a colloquy of six additional questions, none of which drew an objection, defense counsel requested a sidebar, addressed the improper questions, and agreed to a cautionary instruction. The trial justice stated:

- 7 -

> "Ladies and gentlemen, to the extent that this witness was asked questions regarding whether he had provided certain information or failed to provide certain information to law enforcement at any point in time prior to his taking the stand here, I will remind you that as set forth in the preliminary instructions last week that the defendant at all times has had and continues to have the right to remain silent, and that his decision or determination not to offer any information or speak to law enforcement at any point in time is consistent with his exercise of that right to remain silent. And from the question asked that was sustained, you cannot in any way draw any unfavorable inference or adverse inference from this defendant's decision not to provide such information to law enforcement."

Defense counsel expressed satisfaction with the limiting instruction but did not foreclose the possibility that after conducting legal research, he might move for a mistrial.

Shortly thereafter, defendant's testimony concluded, and, as he forewarned the trial justice, defense counsel moved to pass the case. The next day, the trial justice denied the motion. In so doing, the trial justice recognized that the jurors were instructed on multiple occasions that defendant has a constitutional right to remain silent, *viz.*, in a jury questionnaire, on the first day of jury selection, during voir dire, and in the cautionary instruction. The trial justice also foreshadowed that the final charge would again instruct the jury on the constitutional principle that a defendant has the right to remain silent. The trial justice articulated specific findings:

"In the context of this case this is not such an explosive question that was being asked that is not able to be addressed through the course of a cautionary instruction. Indeed, this [c]ourt finds that the cautionary instruction provided already was enough to cure any prejudice, and the nature of that question and the cautionary instruction do not warrant the need for individual *voir dire* of the jurors, and in any event, they will again be instructed on these very same principles.

"This [c]ourt is satisfied in the total context of this case that such a limiting instruction, the final instructions, both of which build upon the preliminary instructions given at the start of jury selection cures any prejudice to the defendant in challenging his silence at the time of his arrest."

Subsequently, the trial justice charged the jury, and again indicated:

"To the extent that questions were asked but not permitted to be answered regarding what the defendant did or did not say to law enforcement at any point in time after his arrest and up until this trial, you are further instructed that the defendant had the right to decline to speak to law enforcement, and no adverse inference can be drawn by the defendant's election to exercise his constitutional right to remain silent, which is a right that we all have.

"The defendant's credibility should be determined based upon what he testified to here in the courtroom, and you should not consider the defendant's election to exercise his right to remain silent at an earlier time in assessing his credibility."

Defense counsel expressed no objection to any portion of the final charge but cautioned that the absence of an objection should not be interpreted as "conceding

the adequacy of the instruction [the trial justice] gave in an effort to cure the comment from [the prosecutor] that came up yesterday."

**Standard of Review**

"It is well settled that, when called upon to review a trial justice's ruling on a motion for a mistrial, this Court affords the decision great weight and will disturb the decision only if it was clearly wrong." *State v. Barboza*, 262 A.3d 684, 689 (R.I. 2021). As we have noted, "the trial justice has a front row seat during the trial so that the trial justice can best evaluate the effects of any prejudice on the jury." *Id.* (brackets omitted) (quoting *State v. Barkmeyer*, 949 A.2d 984, 1007 (R.I. 2008)). "As such, in ruling on a motion for a mistrial, 'the trial justice must determine whether the evidence would cause the jurors to be so inflamed as to make them unable to decide the case on the basis of the evidence presented.'" *Id.* (quoting *State v. Enos*, 21 A.3d 326, 332 (R.I. 2011)).

**Discussion**

On appeal, defendant raises a single issue and contends that despite the curative instructions, the trial justice erred when she declined to grant a mistrial based upon the prosecutor's impermissible post-arrest inquiry. The error was particularly prejudicial, defendant asserts, because the prosecutor's questions occurred during the cross-examination of defendant and were aimed at undermining

his credibility before the jury by suggesting that defendant's assertion of the defense of others to justify his actions was contrived after the shooting.  We agree.

It is beyond peradventure that "[t]he use of a defendant's post-*Miranda* admonition that he will remain silent for impeachment purposes violates the due-process clause of the Fourteenth Amendment." *State v. Goddard*, 799 A.2d 263, 266 (R.I. 2002) (brackets omitted).  A half-century ago, the Supreme Court of the United States explicated:

> "When a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes * * * it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony." *Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (quoting *United States v. Hale*, 422 U.S. 171, 182-83 (1975) (White, J., concurring)).

Thus, *Doyle* unmistakably held that the use of a defendant's "silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.*; *see also Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) ("*Doyle* rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'") (quoting *South Dakota v. Neville*, 459 U.S. 553, 565 (1983)).

Critically, before this Court, the state does not suggest that the prosecutor's questions were permissible. The defendant points to our decision in *State v. Sherman*, 113 R.I. 77, 317 A.2d 445 (1974), and claims his situation is "strikingly similar." In our opinion, *Sherman* provides important guideposts but is not dispositive.

In *Sherman*, the prosecutor's closing argument contained the following remark: "Might I point out, Ladies and Gentlemen, that the actual fact of the assault has never been denied." *Sherman*, 113 R.I. at 79, 317 A.2d at 447 (deletion omitted). The defendant's immediate objection was overruled, but when the summation concluded, the trial justice offered a cautionary instruction. *Id.* The next day, the trial justice charged the jury and reiterated the defendant's constitutional right to remain silent. *Id.* at 80, 317 A.2d at 447.

This Court vacated the conviction. *See Sherman*, 113 R.I. at 84, 317 A.2d at 449. We concluded that neither the cautionary instruction nor the final charge remedied the prejudice that was placed before the jury. *See id.* at 82-83, 317 A.2d at 448-49. In so doing, we explained:

> "If such error is to be cured, it is essential that a cautionary instruction be given immediately in order that the seed planted by the remark will not be given time to germinate. In addition to immediacy, adequacy is required. The cautionary instruction must be such that the jury is informed in language understandable by the ordinary, reasonable man that the defendant has a constitutional

- 12 -

right to be free from compulsion of any kind, physical or mental, to testify in his own defense.

"* * * The cautionary instruction will be lacking in the required adequacy to accomplish such result unless it clearly informs the jury that they may not draw any inference or reach any presumption concerning the guilt of the defendant because he did not testify in his own defense. The mere reference to the defendant's constitutional right not to testify is not enough. In our opinion, to be adequate, a cautionary instruction must clearly disclose the thrust of the obligation of the jury to refrain from drawing any inference from such a failure to testify, and impress upon them that, should they do so, they would, in effect, deprive the defendant of his constitutional right to a fair trial and violate their oath as jurors." *Id.* at 81-82, 317 A.2d at 448.

Although we suggested in *Sherman* that the initial cautionary instruction may have been timely—it was rendered at the close of the prosecutor's summation—we nonetheless determined that it was inadequate because it failed "to disclose to the jury the compulsory nature of its obligation to refrain from drawing any inference from defendant's failure to testify." *Sherman*, 113 R.I. at 82, 317 A.2d at 448. Relatedly, this Court determined that even if the final charge satisfied the adequacy requirement, the instruction lacked "immediacy." *Id.* at 83, 317 A.2d at 449; *see also id.* at 82, 317 A.2d at 448 ("We think that the ultimate requirement in a cautionary instruction, to make it effective, is that it be adequate to clearly impress upon the minds of the jurors that they are precluded by their oath from drawing from a failure to testify any inference tending to establish the guilt of the defendant.").

- 13 -

In our opinion, *Sherman* does not control our analysis because, unlike the case at bar, *Sherman* did not concern a prejudicial comment made when the defendant was testifying on his own behalf at his trial. We contrast *Sherman* with *State v. Smith*, 446 A.2d 1035 (R.I. 1982), in which the prosecutor cross-examined the defendant concerning his post-arrest failure "to tell the police the story that he had told at trial * * *." *Smith*, 446 A.2d at 1036. We held that the trial justice improperly permitted cross-examination concerning the defendant's silence, that the error was not harmless, and that the impermissible inquiry violated the defendant's due-process rights. *Id.* Our framing of the issue in *Smith* applies equally in the present context:

> "The crucial issue * * * was one of credibility. The line of questioning which was improperly allowed bore directly on the credibility of the defendant's testimony. We cannot say, therefore, that * * * the error did not contribute to the guilty verdict." *Id.*

Thus, in *Smith*, we vacated the defendant's conviction and remanded for a new trial. *Id.*

To be sure, unlike *Smith*, the trial justice immediately sustained the objections, and, therefore, defendant's answers were never heard by the jury. However,

> "[s]ilence in the wake of [*Miranda*] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. * * * Moreover, while it is true that the *Miranda* warnings contain no express assurance that

- 14 -

silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 617-18.

Our conclusion that the offending cross-examination questions were inherently prejudicial and violated defendant's right to due process is buttressed by several factors. During the sidebar, the prosecutor's own explanatory statement revealed the aim: "I was just trying to elicit that we haven't heard [about the defense of others theory] before." This explanation strikes at the heart of a defendant's right to remain silent. Additionally, after the trial justice sustained the first objection, the prosecutor remarkably responded with a second question that was substantively identical to the previous objectionable question. As counsel has impressed upon this Court, in light of Baker's decision to testify, the jury was never aware that defendant had invoked his right to remain silent until the prosecutor's improper questions. Finally, the offending questions occurred in the context of an indictment brought by the state against defendant alleging serious offenses carrying the possibility of multiple life sentences upon conviction. Having made the decision to testify in his own defense and place his credibility before the jury in this, defendant's trial, Baker was entitled to take the witness stand with the expectation that the state would not violate his constitutional rights. We hasten to add one final caveat; our conclusion should not be construed to suggest that a violation of a defendant's constitutional

rights constitutes *per se* reversible error. Nothing in this opinion departs from our harmless error precedent, which the state, understandably, did not raise.

In no way do we insinuate criticism of the trial justice's efforts. We fully appreciate the complexity of this unexpected eleventh-hour occurrence, as well as the trial justice's efforts to salvage a trial that was in its seventh day and on the precipice of conclusion. The trial justice's endeavors notwithstanding, we conclude that the offending questions could not be cured through a limiting instruction and a mistrial was warranted. *See State v. Ordway*, 619 A.2d 819, 828 (R.I. 1992); *Smith*, 446 A.2d at 1036.

## Conclusion

For the reasons stated, we vacate the judgment of conviction. The papers in this case are remanded to the Superior Court for further proceedings consistent with this opinion.

# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Trequan Baker. |
| **Case Number** | No. 2024-280-C.A.<br>(P1/22-1236AG) |
| **Date Opinion Filed** | March 24, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br>For Defendant:<br><br>Angela M. Yingling<br>Rhode Island Public Defender |