Joseph Calvin THOMAS *v.*
STATE of Arkansas

CR 78-166                                        583 S.W. 2d 32

Opinion delivered June 25, 1979
(Division II)

*McArthur & Lassiter, P.A.,* by: *Jack T. Lassiter,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Catherine Anderson,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant Joseph Calvin Thomas was charged with the first degree murder of Jacob Martin, Jr., by shooting him on July 31, 1977. Thomas was found guilty of second degree murder. On appeal, he contends that the evidence was insufficient to support the jury verdict finding him guilty. We find sufficient evidence and affirm.

Martin died as a result of a wound inflicted by the firing of a .38 caliber pistol by appellant. The issue of second degree murder was submitted to the jury as a lesser included offense by an instruction setting out Ark. Stat. Ann. § 41-1503 (1) (b) (Repl. 1977), which defines that offense as follows:

A person commits murder in the second degree if he knowingly causes the death of another person under

circumstances manifesting extreme indifference to the value of human life.

The case was properly submitted on the issue of justification. See Ark. Stat. Ann. § 41-110 (3) (Repl. 1977). Justification is a defense which becomes an issue when any evidence tending to support its existence is introduced by either the defendant or the state. Ark. Stat. Ann. §§ 41-502, 41-110 (3) (Repl. 1977). Those portions of the statute applicable here [41-507 (Repl. 1977)] provide:

(1) A person is justified in using deadly physical force upon another person if he reasonably believes that the other person is: (a) committing or about to commit a felony involving force or violence; or (b) using or about to use unlawful deadly physical force.

(2) A person may not use deadly physical force in self-defense if he knows that he can avoid the necessity of using that force with complete safety: (a) by retreating, except that a person is not required to retreat if he is in his dwelling and was not the original aggressor,
. . .

The court gave an instruction to the jury in the words of the statute.

It is the position of appellant that the evidence presented by the state substantiated a defense of justification in that it showed that:

1. The deceased was about to commit a felony involving force or violence.

2. The deceased was about to use unlawful deadly force.

3. Thomas was in his dwelling at the time of the incident.

4. Thomas was not the original aggressor.

The state had the burden of negating this defense. Ark.

Stat. Ann. §§ 41-115 (5) (c), - 110 (1) (a), - 110 (3) (Repl. 1977). Thus, argues appellant, the state failed to present sufficient evidence that he knowingly caused the death of Martin under circumstances manifesting extreme indifference to human life.

As we view the evidence, the answer to the question posed by appellant turns upon the question of justification, for, unless appellant was justified in the shooting of Martin, the evidence is ample to sustain a conviction of second degree murder.[1] In evaluating the evidence, appellant views it, for the most part, in the light most favorable to him. We must view it, however, in the light most favorable to the state. *Stout v. State*, 263 Ark. 355, 565 S.W. 2d 23. We will state it in that light.

The shooting was witnessed by at least three persons other than the deceased and the defendant. It took place on the porch of a dwelling house at 1860 Summit in Little Rock, where both Martin and Thomas lived. Phillip Bryant, an 11-year-old boy, who lived next door, was one of them. His father and Ronald Lee Dixon were the others. After witnessing the shooting, Dixon called the police. Dixon, Bryant, Sr., and a man named Walter Jones were playing cards in Dixon's house, directly across the street from the house at 1860 Summit Street. Thomas had been present there and had planned to play with the others, but Bryant said that he went back across the street several times. The shooting took place shortly after the last of these trips.

The Bryant youth was upstairs in his room, looking out the window, when he saw Jacob Martin come through the screen door which opened onto the porch at 1860 Summit. He testified that Joe Thomas immediately followed Martin out. He said that Martin was holding a plate in one hand and that Thomas fired one shot which missed Martin, and that Martin, then holding the plate with both hands, threw it at Thomas, who then fired the second shot which struck Martin.

---

[1]Even though appellant's testimony at the trial seems to assert accident rather than justification, he does not contend, on appeal, that the slaying was accidental.

The senior Bryant said that he and the others looked across the street and saw Martin come out of the house holding a plate of food on which there were eating utensils and that Thomas followed closely, carrying a gun at his side. He said that Martin was holding the plate with both hands and that the two appeared to be arguing, but that Martin had his back to Thomas and was standing near the steps when Thomas fired the pistol without raising it. Then, he said, Martin turned and, using both hands, threw the plate of food at Thomas, who shielded himself against the plate, took a step backward and shot Martin, who then fell to the porch. He said that Martin was unable to get up, although he tried several times.

Dixon said that he looked across the street when he heard the first shot, which apparently went through the porch floor. He said that he saw Martin throw a plate of food, on which there were utensils, at Thomas. He said that the next instant he saw the second shot. It seemed to him that the two were arguing. He, too, stated that Martin held the plate with both hands when he threw it and that Martin and Thomas were from four to six feet apart. Both Bryant and Dixon observed through a picture window in the Dixon house.

Dixon said that about five seconds elapsed between the time he looked up and the time the plate was thrown. Estimates of the three witnesses of the time interval between the throwing of the plate and the fatal shot ranged from a split second to five seconds. The Bryant youth and Dixon said that Martin had nothing in his hands after he threw the plate. Bryant, Sr., did not think that anything then remained in Martin's hands. Dixon knew that Martin had a knife and fork on the plate, but said he couldn't see what Martin had in his left hand.

After Martin fell, the elder Bryant saw Thomas walk across the porch toward Martin, holding the pistol over Martin's face, and then walk around Martin, still pointing the pistol at him. Bryant said that when Martin did not get up, Thomas, who was not wearing a shirt, went back into the house, but came out between 30 seconds and one minute later

with a shirt, which he put on as he crossed the street on his way to the Dixon house. He knocked on Dixon's door, but Dixon told him to leave and, at Bryant's suggestion, called the police. Dixon said that Thomas then jumped off the porch and left.

At about 3:00 p.m., Lawrence Evans heard of the shooting. Later he went to his mother's house at 721 West 17th Street and saw Thomas there. He said that Thomas was nervous and upset and wanting to know if Martin was dead. According to Evans, he and others tried to calm Thomas and persuade him to turn himself over to the police. He said that Thomas kept saying, "He shouldn't have thrown the plate at me," and then said, the "guy had a knife."

There seems to have been no witness to events preceding Martin's coming out the front door. Thomas gave the only accounts of these events, but they are not consistent.

Thomas made a statement to officers Chapman and Garner at about 6:20 p.m. He gave this version of the events leading up to the front porch episode:

> Thomas came into the house at 1:00 or 1:30 p.m., after having been to a liquor store and having purchased a bottle of wine. He found Martin sitting in the kitchen cursing some hungry children. When Thomas remonstrated, Martin cursed Thomas, jumped up and advanced on Thomas, holding a knife. Thomas fled to his room, with Martin chasing him up the hall. Thomas went into his room, got his pistol, and went back into the hall where Martin was standing and fired a shot into the air. Martin then ran out the screen door and Thomas fired another shot in that direction but it did not hit Martin. Martin then picked up a plate, came toward Thomas while holding the knife in one hand, and threw the plate, hitting Thomas in the mouth. Thomas then fired the shot which hit Martin and proved to be fatal. Thomas then remarked that he ought to kill Martin, but when Martin pleaded with him, said that he would not. Thomas then went into the house, but soon came back out and went to his aunt's house.

He did not know Martin was dead until he went to the police station some hours later.

Thomas testified. His testimony varied from the statement in important particulars. He stated that he did not shoot Martin intentionally. In his testimony, he recited the following version:

Thomas had found two children cooking in the kitchen and heard hollering upstairs, so he went up and found two small children, whom he brought downstairs to the kitchen. After asking the two who were cooking to share their food with the little ones, Thomas went across the street to Dixon's house. When he told the cardplayers about the children and their being left alone, he was advised to call the police. Instead, he went back across the street to the house in which both he and Martin lived and found Martin in the hall, with a plate of food in his hand. When he asked Martin to give some of it to the children, Martin refused, profanely. Thomas remonstrated strongly, but then saw that Martin had a knife and, becoming frightened because Martin had a reputation for cutting, ran to his room. Martin followed, entered the room and lunged at Thomas, who then grabbed his pistol off his dresser and fired it into the wall and floor. Martin then turned and left. Thomas did not know where he went. Thomas then tried to leave the house, but when he got to the porch, he found Martin hunched over against the wall. Martin cursed Thomas and threw the plate in his face. Martin was still holding the knife in his hand. When the plate hit Thomas in the face, the pistol he was still carrying went off and Martin fell to the floor. Thomas did not deliberately shoot Martin, but was afraid that Martin, who was cursing and making faces, was going to hurt him. Thomas saw Martin lying on the porch and went to see if he could give help. When he saw that Martin was lying still, he went into the house to ask others who lived there to call an ambulance and the police. Instead, they jumped up and left. Thomas then went to the Dixon house to use the telephone, but when denied admission, went to his

aunt's house[2] and later went to the police station.

He did not hold the pistol in Martin's face as Martin lay prone on the porch, go into the house to get a shirt, or have to be persuaded to go to the police station. The witnesses who described the encounter on the porch did not see what they said they saw.

Thomas was corroborated only by the facts that a knife was found on the porch, six to eight inches from Martin's left hand, after Thomas had left the scene, and that there was a broken plate near the doorway. Thomas did have a small cut on his lips when he reached the police station. In his brief, Thomas tacitly concedes that the evidence might justify the finding that the knife left Martin's hand when he threw the plate. Thomas said that he had tried unsuccessfully to find the two people who were inside the house when he reentered after the shooting. Yet, he did not give their names or other means of identifying them. He did give the names of two people he said he had seen across the street and had asked to call an ambulance, but he did not present them as witnesses. It is also true that Dixon, who gave some of the testimony most damaging to Thomas, had a criminal record and there were discrepancies in his testimony as compared with that he gave at a preliminary hearing. Still, the resolution of conflicts, inconsistencies and contradictions in the evidence was for the jury. *Scott v. State,* 254 Ark. 271, 492 S.W. 2d 902; *Houpt v. State,* 249 Ark. 485, 459 S.W. 2d 565; *Hill v. State,* 250 Ark. 812, 467 S.W. 2d 179. The jury's conclusion on the credibility of the witnesses is binding on this court. *Pope v. State,* 262 Ark. 476, 557 S.W. 2d 887; *King v. State,* 194 Ark. 157, 106 S.W. 2d 582; *Butler v. State,* 192 Ark. 802, 95 S.W. 2d 636. The jury obviously resolved these questions adversely to appellant. We cannot say that a reasonable mind could not have reached the jury's conclusion from all the evidence.

We do not agree with appellant that, as a matter of law, the facts showed that Martin was about to commit a felony involving force or violence or about to use deadly physical force, either lawfully or unlawfully. The jury could have

---

[2]Appellant's aunt was the mother of Lawrence Evans.

found, and apparently did find, from the testimony of eyewitnesses that Martin was only attempting to deter his pursuer from shooting him with the pistol. The jurors were not required to believe that Martin then had a knife in one hand or, if he did, that he ever attempted to use it as a weapon. The jury was not required to accept appellant's testimony as to what happened before the emergence of Martin on the front porch, particularly in view of the differences in his accounts of the events. It could even totally reject evidence that Martin was the original aggressor. The jury was not required to accept Thomas's testimony as uncontradicted, and we are not required to so view it. *McCray* v. *State,* 254 Ark. 601, 494 S.W. 2d 708; *Sanders* v. *State,* 258 Ind. 11, 279 N.E. 2d 194 (1972); *Cook* v. *State,* 46 Ala. App. 663, 248 So. 2d 158 (1971); *People* v. *Amata,* 270 Cal. App. 2d 575, 75 Cal. Rptr. 860 (1969). See also, *State* v. *Monaco,* 230 N.W. 2d 485 (Iowa, 1975); *Hudson* v. *State,* 77 Ark. 334, 91 S.W. 299; *Clark* v. *State,* 246 Ark. 1151, 442 S.W. 2d 225; *Lindsey* v. *State,* 172 Ark. 1176, 288 S.W. 915; *Lucius* v. *State,* 116 Ark. 260, 170 S.W. 1016. The jury had a right to accept that part of his statement and testimony it believed to be true and to reject that part it believed to be false. *Anderson* v. *State,* 210 Ark. 548, 197 S.W. 2d 36; *Smith* v. *State,* 216 Ark. 1, 223 S.W. 2d 1011, cert. den. 339 U.S. 916, 70 S. Ct. 562, 94 L. Ed. 1341 (1950); *Smith* v. *State,* 218 Ark. 725, 238 S.W. 2d 649; *Cranford* v. *State,* 156 Ark. 39, 245 S.W. 189; *Howard* v. *State,* 34 Ark. 433.

If the jury believed, as it could from the evidence, that Martin did not engage in conduct that created a substantial danger of death or serious physical injury to Thomas, or that the circumstances did not demonstrate that Martin acted with extreme indifference to the value of human life, then it could not have concluded that he had committed an aggravated assault, as appellant suggests. See Ark. Stat. Ann. § 41-1604 (Repl. 1977). The jury was not bound to conclude that Martin was about to commit battery in the first degree, as appellant contends, because it was not unreasonable to believe that Martin did not act, or intend to act, with the purpose of causing serious physical injury to Thomas, or of seriously or permanently disfiguring him or of destroying, amputating or permanently disabling a member or organ of

Thomas's body or that the circumstances manifested that he was acting with extreme indifference to the value of human life. See Ark. Stat. Ann. § 41-1601 (1) (Repl. 1977).

Even if the jury believed that Martin was the original aggressor, it was not established, as a matter of law, that the use of deadly physical force by Thomas was justified even though, as an occupant of the house, he was not required to retreat. Ark. Stat. Ann. § 41-507 (2) (a). It was also Martin's dwelling. Appellant admits that he chased Martin from the dwelling onto the front porch. Even if Martin was the original aggressor, if he had, in good faith, withdrawn from the encounter, and the danger to Thomas was no longer immediate, urgent and pressing, Thomas was not justified in pursuing him to continue the fight or to use deadly physical force on him. *McDonald* v. *State*, 104 Ark. 317, 149 S.W. 95. The time lapse between the throwing of the plate and the fatal shot may have been such that the jury concluded that Thomas acted knowingly and deliberately in a spirit of revenge which manifested an extreme indifference to the value of human life.

The judgment is affirmed.

We agree. HARRIS, C.J., HOLT and HICKMAN, JJ.