732 So.2d 1044 (1999)
Kathleen WEIAND, Petitioner,
v.
STATE of Florida, Respondent.
No. 91,925.
Supreme Court of Florida.
March 11, 1999.
Rehearing Denied April 30, 1999.
*1046 James Marion Moorman, Public Defender, and John C. Fisher, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Petitioner.
Robert A. Butterworth, Attorney General, Robert J. Krauss, Senior Assistant Attorney General, Chief of Criminal Law, and Scott A. Brown, Assistant Attorney General, Tampa, Florida, for Respondent.
Peter Margulies, Professor of Law, St. Thomas University School of Law, Miami, Florida, for Amici Curiae, Center Against Spouse Abuse (CASA), et al.
PARIENTE, J.
We have for review a decision of the Second District Court of Appeal certifying the following question to be of great public importance:
SHOULD THE RULE OF STATE v. BOBBITT, 415 So.2d 724 (Fla. 1982), *1047 BE CHANGED TO ALLOW THE CASTLE DOCTRINE INSTRUCTION IN CASES WHERE THE DEFENDANT RELIES ON BATTEREDSPOUSE SYNDROME EVIDENCE (AS NOW AUTHORIZED BY STATE V. HICKSON, 630 So.2d 172 (Fla. 1994)[)] TO SUPPORT A CLAIM OF SELF-DEFENSE AGAINST AN AGRESSOR WHO WAS A COHABITANT OF THE RESIDENCE WHERE THE INCIDENT OCCURRED?
Weiand v. State, No. 95-01121, on rehearing from 701 So.2d 562 (Fla. 2d DCA 1997).
We rephrase the question as follows:
SHOULD THE LAW IMPOSE A DUTY TO RETREAT FROM THE RESIDENCE BEFORE A DEFENDANT MAY JUSTIFIABLY RESORT TO DEADLY FORCE IN SELF-DEFENSE AGAINST A CO-OCCUPANT, IF THAT FORCE IS NECESSARY TO PREVENT DEATH OR GREAT BODILY HARM?
As rephrased, we answer the certified question in the negative and recede from our contrary holding in Bobbitt.

I. JURISDICTION
We first address our jurisdiction. Article V, section 3(b)(4) of the Florida Constitution, vests this Court with the discretionary jurisdiction to review any decision of a district court of appeal that passes upon a question certified by it to be of great public importance.
On appeal to the Second District, the defendant asserted as error the trial court's refusal to grant her request to instruct the jury on the privilege of nonretreat from the home, characterized as the "castle doctrine instruction" in the certified question. In affirming the conviction, and rejecting all claims of error asserted by the petitioner, the Second District specifically held: "We have examined each [issue raised] together with the entire trial transcript and conclude that none of the errors asserted require reversal." Id. at 563. In so holding, the Second District necessarily ruled upon the question it certified, which was a dispositive issue in Weiand's case.[1]
These circumstances distinguish this case from Gee v. Seidman & Seidman, 653 So.2d 384, 385 (Fla.1995), which held that jurisdiction had been improvidently granted because "the question certified by the district court d[id] not reflect the issue actually ruled upon by the court." This case can also be distinguished from Revitz v. Baya, 355 So.2d 1170, 1171 (Fla.1977), where we discharged jurisdiction because "the District Court specifically found, it unnecessary to pass upon" the question certified. (Emphasis supplied.)
In this case, the Second District was bound by our precedent in Bobbitt to reject Weiand's argument concerning the jury instruction because a district court of appeal does not have the authority to overrule a decision of this Court. See Hoffman v. Jones, 280 So.2d 431, 440 (Fla. 1973). Thus, certification of the question to this Court was the only available judicial means by which Bobbitt could be overruled. While a discussion in the Second District's opinion of the issues raised by the certified question would have been helpful to this Court, it was not a necessary predicate to our exercise of jurisdiction.[2]
After briefing and oral argument, Weiand filed a notice of voluntary dismissal in this Court because she was granted executive clemency on December 23, 1998. As *1048 we have done in the past, we exercise our discretion to retain jurisdiction because we consider this issue to be of great public importance. See State v. Schopp, 653 So.2d 1016, 1018 (Fla.1995); Holly v. Avid, 450 So.2d 217, 218 n. 1 (Fla.1984).

II. FACTS
Kathleen Weiand was charged with first-degree murder for the 1994 shooting death of her husband Todd Weiand. Weiand shot her husband during a violent argument in the apartment where the two were living together with their seven-week-old daughter. At trial Weiand claimed self-defense and presented battered spouse syndrome[3] evidence pursuant to Hickson in support of her claim. Weiand testified that her husband had beaten and choked her throughout the course of their three-year relationship and had threatened further violence if she left him.
Two experts, including Dr. Lenore Walker, a nationally recognized expert on battered women, testified that Weiand suffered from "battered woman's syndrome." Dr. Walker detailed Weiand's history of abuse by her husband and testified about the effect of the abusive relationship on Weiand. Based on her studies, her work with Weiand and Weiand's history of abuse, Dr. Walker concluded that when Weiand shot her husband she believed that he was going to seriously hurt or kill her.
Dr. Walker opined that there were several reasons why Weiand did not leave the apartment that night during the argument, despite apparent opportunities to do so: she felt that she was unable to leave because she had just given birth seven weeks earlier; she had been choked unconscious; she was paralyzed with terror; and experience had taught her that threats of leaving only made her husband more violent.
At the charge conference following the close of the evidence, defense counsel requested that the following standard jury instruction be given:
If the defendant was attacked in [his][her] own home or on [his][her] own premises, [he][she] had no duty to retreat and had the lawful right to stand [his][her] ground and meet force with force, even to the extent of using force likely to cause death or great bodily harm if it was necessary to prevent either death or great bodily harm.
Fla. Std. Jury Instr. (Crim.), "Justifiable Use of Deadly Force," § 3.04(d), at 49 (brackets in original). In accordance with this Court's opinion in Bobbitt, the trial court refused the request to give this "defense of home" instruction. Instead, the trial court only gave the instruction applicable in all self-defense cases regarding the duty to retreat:
The fact that the defendant was wrongfully attacked cannot justify her use of force likely to cause death or great bodily harm if by retreating she could have avoided the need to use that force.
See Fla. Std. Jury Instr. (Crim.), "Justifiable Use of Deadly Force," § 3.04(d), at 48.
During closing arguments, the prosecutor used this standard instruction to the State's advantage by emphasizing Weiand's duty to retreat. The prosecutor stressed as "critical" that the killing could not be considered justifiable homicide unless Weiand had exhausted every reasonable means to escape the danger, including fleeing her home:
She had to exhaust every reasonable means of escape prior to killing him. Did she do that? No. Did she use the *1049 phone that was two feet away? No. Did she go out the door where her baby was sitting next to? No. Did she get in the car that she had driven all over town drinking and boozing it up all day? No.
The jury found Weiand guilty of second-degree murder and the trial court sentenced her to eighteen years' imprisonment. The Second District affirmed her conviction and sentence, see Weiand, 701 So.2d at 565, but on rehearing certified the question of whether this Court should recede from Bobbitt.

III. THE PRIVILEGE OF NONRETREAT FROM THE RESIDENCE
Under Florida statutory and common law, a person may use deadly force in self-defense if he or she reasonably believes that deadly force is necessary to prevent imminent death or great bodily harm. See § 776.012, Fla. Stat. (1995); Wilson v. State, 30 Fla. 234, 255, 11 So. 556, 561 (1892); DeLuge v. State, 710 So.2d 83, 84 (Fla. 5th DCA 1998); Fla. Std. Jury Instr. (Crim.) § 3.04(d), at 46. Even under those circumstances, however, a person may not resort to deadly force without first using every reasonable means within his or her power to avoid the danger, including retreat. See Bobbitt, 415 So.2d at 725; Hedges v. State, 172 So.2d 824, 827 (Fla.1965). The duty to retreat emanates from common law, rather than from our statutes. See Hedges, 172 So.2d at 827.[4]
There is an exception to this common law duty to retreat "to the wall," which applies when an individual claims self-defense in his or her own residence. See id. at 827; Pell v. State, 97 Fla. 650, 665, 122 So. 110, 116 (1929); Danford v. State, 53 Fla. 4, 13, 43 So. 593, 597 (1907). An individual is not required to retreat from the residence before resorting to deadly force in self-defense, so long as the deadly force is necessary to prevent death or great bodily harm. See Hedges, 172 So.2d at 827; Pell, 97 Fla. at 665, 122 So. at 116; Danford, 53 Fla. at 13, 43 So. at 597.
The privilege of nonretreat from the home, part of the "castle doctrine,"[5] has early common law origins. See Bobbitt, 415 So.2d at 725; Hedges, 172 So.2d at 827; Pell, 97 Fla. at 665, 122 So. at 116; Danford, 53 Fla. at 13, 43 So. at 597; New York v. Tomlins, 213 N.Y. 240, 107 N.E. 496, 497-98 (1914). In Tomlins, the defendant claimed self-defense when attacked in his home by his son. 107 N.E. at 496. In reversing the defendant's conviction because the duty to retreat instruction was given, Justice Cardozo explained the historical basis of the privilege of nonretreat from the home:
It is not now and never has been the law that a man assailed in his own dwelling is bound to retreat. If assailed there, he may stand his ground and resist the attack. He is under no duty to take to the fields and the highways, a fugitive from his own home. More than 200 years ago it was said by Lord Chief Justice Hale: In case a man "is assailed *1050 in his own house, he need not flee as far as he can, as in other cases of se defendendo,[[6]] for he hath the protection of his house to excuse him from flying, as that would be to give up the protection of his house to his adversary by flight." Flight is for sanctuary and shelter, and shelter, if not sanctuary, is in the home.... The rule is the same whether the attack proceeds from some other occupant or from an intruder.

Id. at 497-98 (emphasis supplied) (citations omitted).
In Hedges, this Court applied the privilege of nonretreat from the residence where the attacker was not an intruder but an invitee with the defendant's permission to be on the premises. In that case, the defendant and the victim had maintained a long-term intimate relationship, and on the morning of the shooting the victim was an invitee, lawfully in the defendant's home. See Hedges v. State, 165 So.2d 213, 214-15 (Fla. 2d DCA 1964), quashed, 172 So.2d 824 (Fla.1965). In instructing the jury on the law of self-defense, the trial court informed the jury that the defendant was required to use "all reasonable means within his power and consistent with his own safety to avoid the danger and avert the necessity of taking human life." Hedges, 172 So.2d at 826. The trial court failed to instruct the jury that the defendant was under no duty to retreat from her residence. See id. at 827.
In reversing the conviction of manslaughter, our Court held:

The instruction correctly stated the law as far as it went but again it was not complete. The quoted language placed upon the accused the duty to use all reasonable means consistent with her own safety to avoid the danger and avert the necessity of taking human life. To the lay mind this well could be construed to mean the duty to run or to get out of the way. There is no such duty when one is assaulted in his own home, despite the common law duty to "retreat to the wall" when one is attacked elsewhere. Pell v. State, 97 Fla. 650, 122 So. 110 [(1929)]. While Pell involved a trespasser, it clearly states the rule to be that when one is violently assaulted in his own house or immediately surrounding premises, he is not obliged to retreat but may stand his ground and use such force as prudence and caution would dictate as necessary to avoid death or great bodily harm. When in his home he has "retreated to the wall." Pell further decides that such an instruction should be an element of the charge on self-defense where the evidence supports it. Other courts have held that a man is under no duty to retreat when attacked in his own home. His home is his ultimate sanctuary.
Id. at 826-27 (emphasis supplied).
Eighteen years later, in Bobbitt, this Court considered whether the privilege of nonretreat from the home should also apply where the defendant killed her co-occupant husband in self-defense, after being attacked without provocation. 415 So.2d at 725-26. This Court rejected the extension of Hedges[7] under those circumstances:
[T]he privilege not to retreat, premised on the maxim that every man's home is his castle which he is entitled to protect from invasion, does not apply here where both Bobbitt and her husband had equal rights to be in the "castle" and neither had the legal right to eject the other.
Id. at 726.
Justice Overton, in a strongly-worded dissent, disagreed with the majority's decision because it was contrary to a "basic *1051 premise in our law that the home is a special place of protection and security." Id. at 727. He further criticized the distinction made by the majority that authorized the privilege of nonretreat instruction in cases like Hedges, where the aggressor was an invitee with a legal right to be on the premises, but not where the aggressor was a co-occupant. See id. at 726-27.
At the time we rendered our decision in Bobbitt in 1982, we were in a minority of jurisdictions[8] that refused to extend the privilege of nonretreat from the residence where the aggressor was a co-occupant. Since our decision in Bobbitt, an even greater number of jurisdictions have declined to impose a duty to retreat from the residence.[9]See generally H.J. Alperin, Annotation, Homicide: Duty to Retreat Where Assailant and Assailed Share the Same Living Quarters, 26 A.L.R.3d 1296 (1969 & Supp.1998).

IV. RECONSIDERATION OF OUR DECISION IN BOBBITT

We now conclude that it is appropriate to recede from Bobbitt and adopt Justice Overton's well-reasoned dissent in that case. We join the majority of jurisdictions that do not impose a duty to retreat from the residence when a defendant uses deadly force in self-defense, if that force is necessary to prevent death or great bodily harm from a co-occupant.
There are two distinct reasons for our conclusion. First, we can no longer agree with Bobbitt's minority view that relies on concepts of property law and possessory rights to impose a duty to retreat from the residence. 415 So.2d at 726. Second, based on our increased understanding of the plight of victims of domestic violence in the years since our decision in Bobbitt, we find that there are sound policy reasons for not imposing a duty to retreat from the residence when a defendant resorts to deadly force in self-defense against a co-occupant. The more recent decisions of state supreme courts confronting this issue have recognized that imposing a duty to retreat from the residence has a potentially damaging effect on victims of domestic violence claiming self-defense. See, e.g., New Jersey v. Gartland, 149 N.J. 456, 694 *1052 A.2d 564, 569-71 (1997); Ohio v. Thomas, 77 Ohio St.3d 323, 673 N.E.2d 1339, 1343 (1997).

A. Bobbitt's Possessory Rights Distinction
In refusing to extend the privilege of nonretreat in Bobbitt, we held that
the privilege not to retreat ... does not apply here where both Bobbitt and her husband had equal rights to be in the "castle" and neither had the legal right to eject the other.
415 So.2d at 726. Thus, our decision in Bobbitt appears to have been grounded upon the sanctity of property and possessory rights, rather than the sanctity of human life.
In light of our decision in Hedges, our holding in Bobbitt created a distinction that resulted in the privilege of nonretreat applying when the defendant is defending herself against an invitee, with a legal right to be on the premises, but not when defending herself against a co-occupant, who also had a legal right to be on the premises. Justice Overton illustrated the effect of this "illogical distinction" in his dissenting opinion in Bobbitt:
Under the majority opinion, a woman killing her paramour in her home has more protection under the law than a woman who kills her husband in her home. More difficult still to understand is the application of the majority's rule to the situation where a mother is attacked in her home by a nineteen-year-old son. If the son is living in the home, the mother has a duty to retreat before she can use deadly force, but, if the son is not residing in the home, the mother has no duty to retreat before such force is used.
Id. at 728.

Bobbitt's distinction based on possessory rights may be important in the context of defending the home. See supra note 6; Falco v. State, 407 So.2d 203, 208 (Fla. 1981); Alday v. State, 57 So.2d 333, 333 (Fla.1952); State v. White, 642 So.2d 842, 844 (Fla. 4th DCA 1994). However, the privilege of nonretreat from the home stems not from the sanctity of property rights, but from the time-honored principle that the home is the ultimate sanctuary. See Hedges, 172 So.2d at 827; Tomlins, 107 N.E. at 497-98. As has been asked rhetorically, if the duty to retreat from the home is applied to a defendant attacked by a co-occupant in the home, "whither shall he flee, and how far, and when may he be permitted to return?" Jones v. Alabama, 76 Ala. 8, 16 (1884); see also Gartland, 694 A.2d at 570.
The omission of the jury instruction on the privilege of nonretreat from the home is not cured by the jury instruction given in all self-defense cases that there is no legal duty to retreat if retreating would increase the danger of death or great bodily harm. See Fla. Std. Jury Instr. (Crim.), "Justifiable Use of Deadly Force," § 3.04(d) at 48. In Hedges, the jury was instructed that the defendant had to use all reasonable means consistent with her own safety to avoid the danger before resorting to deadly force in self-defense. 172 So.2d at 826-27. We found that the instructions were incomplete because, without the privilege of nonretreat instruction, the jury may have believed that the defendant had a duty to retreat from her home. See id. at 827. For the same reason, we find that in circumstances where the nonretreat instruction is applicable, the instructions are incomplete and misleading if the nonretreat instruction is not given. See id.

B. Implications for victims of domestic violence
1. Imposing a duty to retreat from the home may adversely impact victims of domestic violence.
Although the State argues that nothing has changed in the intervening years since Bobbitt to require us to recede from that decision, to the contrary, much has changed in the public policy of this State, *1053 based on increased knowledge about the plight of domestic violence victims. It is now widely recognized that domestic violence "attacks are often repeated over time, and escape from the home is rarely possible without the threat of great personal violence or death." Thomas, 673 N.E.2d at 1343. As quoted by the New Jersey Supreme Court:
Imposition of the duty to retreat on a battered woman who finds herself the target of a unilateral, unprovoked attack in her own home is inherently unfair. During repeated instances of past abuse, she has "retreated," only to be caught, dragged back inside, and severely beaten again. If she manages to escape, other hurdles confront her. Where will she go if she has no money, no transportation, and if her children are left behind in the "care" of an enraged man?
. . . .
What [the duty to retreat] exception means for a battered woman is that as long as it is a stranger who attacks her in her home, she has a right to fight back and labors under no duty to retreat. If the attacker is her husband or live-in partner, however, she must retreat. The threat of death or serious bodily injury may be just as real (and, statistically, is more real) when her husband or partner attacks her in home, but still she must retreat.
Gartland, 694 A.2d at 570-71 (quoting Maryanne E. Kampmann, The Legal Victimization of Battered Women, 15 Women's Rts. L. Rep. 101, 112-113 (1993)).
Studies show that women who retreat from the residence when attacked by their co-occupant spouse or boyfriend may, in fact, increase the danger of harm to themselves due to the possibility of attack after separation. According to Dr. Lenore Walker, "[t]he Battered would often rather kill, or die himself, than separate from the battered woman." Lenore E. Walker, Terrifying Love: Why Battered Women Kill and How Society Responds 65 (1989).
Experts in the field explain that separation or retreat can be the most dangerous time in the relationship for the victims of domestic violence because "[v]iolence increases dramatically when a woman leaves an abusive relationship." Executive Office of the Governor, The Governor's Task Force on Domestic Violence, The First Report at 55 (January 31, 1994) (hereinafter First Report). A leading expert in the field cites one study which revealed that forty-five percent of the murders of women "were generated by the man's `rage over the actual or impending estrangement from his partner.'" Donald G. Dutton, The Batterer: A Psychological Profile 15 (1995). Another study found that the murder of the battered victim was often "triggered by a walkout, a demand, a threat of separation [which] were taken by the men to represent intolerable desertion, rejection and abandonment. Thus ... the threat of separation is usually the trigger for violence." Kampman, supra at 104 (brackets in original).
The imposition of a duty to retreat from one's residence when faced with a violent aggressor has the most significant impact on women because an overwhelming majority of victims of domestic violence are women. According to the statistics compiled by the Governor's Task Force on Domestic Violence, seventy-three percent of domestic violence victims are women. See First Report, supra at 47; Executive Office of the Governor, The Governor's Task Force on Domestic and Sexual Violence, The Third Report at Appendix S (March 31, 1997) (hereinafter Third Report). Domestic violence is the single major cause of injury to women, more frequent than auto accidents, rapes, and muggings combined. See First report, supra at 2. "Over four thousand women die annually at the hands of their abuser," id. at 3, and in 1995, of all female homicide victims, thirty-nine percent were killed during domestic violence incidents. See *1054 Third report, supra at Appendix S.[10] These studies and other similar findings in the intervening years since Bobbitt provide proof of Justice Overton's observation that retaining a duty to retreat from the home "clearly penalizes spouses, and particularly wives, in defending themselves from an aggressor spouse." State v. Rippie, 419 So.2d 1087, 1087 (Fla.1982) (Overton, J., dissenting).
2. A jury instruction on the duty to retreat may reinforce common myths about domestic violence.
There is a common myth that the victims of domestic violence are free to leave the battering relationship any time they wish to do so, and that the "`beatings' could not have been too bad for if they had been, she certainly would have left." State v. Kelly, 97 N.J. 178, 478 A.2d 364, 377 (1984). See also Joan H. Krause, Of Merciful Justice and Justified Mercy: Commuting the Sentences of Battered Women who Kill, 46 Fla. L.Rev. 699, 712 (1994).
This stereotypical view may extend beyond the jurors deciding the case. One commentator quotes a Maryland judge expressing disbelief of the defendant's claimed defense:
The reason I don't believe it is because I don't believe anything like this could happen to me. If I was you and someone had threatened me with a gun, there is no way that I could continue to stay with them.
Martha R. Mahoney, Victimization or Oppression? Women's Lives, Violence and Agency, in The Public Nature of Private Violence 59, 73 (Martha A. Fineman & Roxanne Mykituk eds.1994) (quoting a Maryland Judge quoted in Maryland's Gender Bias in the Courts Report (Murphy 1993)).
A jury instruction placing a duty to retreat from the home on the defendant may serve to legitimize the common myth and allow prosecutors to capitalize upon it. The prosecutor capitalized on the jury instruction and the common myth in this case when she questioned the believability of Weiand's claims and asked the jury why Weiand did not "go out the door?" and why she did not "get in the car?" before resorting to violence. See also Krause, supra at 712.
In Hickson we authorized the admission of battered spouse syndrome evidence to rebut the common myths concerning battered women and explained the very real dangers faced by women in these relationships. Hickson, 630 So.2d at 174; see Kelly, 478 A.2d at 377. As the expert evidence demonstrates, there are many reasons battered women do not feel free to leave a battering relationship. The woman might have been isolated from her family by the abuser, she may not be able to afford to go, or she may realize that leaving is more dangerous than staying. See Kampman, supra at 101; see generally Hickson, 630 So.2d at 174. To re-affirm Bobbitt with its duty to retreat from the home would undermine our reasons in Hickson for approving expert testimony on battered woman's syndrome.

C. The Evolution of Public Policy
In tandem with the increased understanding of domestic violence, there has been a substantial evolution in the public policy of this state since Bobbitt.[11] A decision *1055 to recede from Bobbitt at this time is an evolution of the common law consistent with this evolution in public policy.[12]
Developments in all three branches of government since Bobbitt reflect the public's concern regarding the plight of victims of domestic violence. For example, recognizing that "violence against women in their own homes is epidemic in our society," First Report, supra at 3, the executive branch has established a task force on domestic violence, whose purpose is the issuance of reports and recommendations which document "the extent of our awareness, and the responsiveness of our resources to battered women and their families." First Report, supra at v.
Since the Bobbitt decision, the Legislature has enacted numerous laws in response to the plight of the victims of domestic violence.[13] For example, the law now requires that a person arrested for domestic violence must be held until first appearance, and the court must consider the safety of the victim in determining whether the defendant should be released and in setting the defendant's bail. See § 741.2901(3), Fla. Stat. (1997); ch. 95-195, § 3, at 1763, Laws of Fla. In addition, the provisions relating to domestic violence injunctions have been substantially revised. The injunctive relief that the trial court can now grant includes awarding the petitioner the exclusive use and possession of the dwelling the parties share. See § 741.30(6)(a)2., Fla. Stat. (1997); ch. 84-343, § 10, at 1989, Laws of Florida. The legislature has made it illegal for any person under a final domestic injunction to possess a weapon. See § 741.30(6)(f), Fla. Stat. (1998). Law enforcement officers investigating alleged incidents of domestic violence are now required to notify the victim about the various resources of protection and the steps to take in pursuing prosecution. See § 741.29(1), Fla. Stat. (1997); ch. 84-343, § 12, at 1991, Laws of Fla.[14]
*1056 Likewise, since our decision in Bobbitt, the judiciary has focused judicial resources on the plight of victims of spousal abuse. Eight domestic violence courts have been organized within the twenty judicial circuits of Florida. See Office of the State Courts Administrator, Survey of the Circuits (Sept.1997) (on file with the State Court Adm'r, Fla. Sup.Ct.). As of 1997, more than half of the twenty judicial circuits had domestic violence task forces. See Third Report, supra at 12. To further the goal of proper judicial response to incidents of domestic violence, this Court has been active in providing educational opportunities for judges throughout the state, and circuit and county court judges now have training available specifically addressing domestic violence and its related issues. See Office of the State Courts Administrator, The Florida Supreme Court's Annual Report to the Florida Legislature on Activities Conducted Under the Court Education Trust Fund at attachment IV (Oct. 8, 1998) (on file with State Court Adm'r, Fla. Sup.Ct.).

D. The Jury Instruction on the Privilege of Nonretreat
The public policy of this State is clearly directed at reducing domestic violence. We have thus considered the views of jurists in the minority position, who have expressed a concern that eliminating a duty to retreat from the residence will increase violence because "[t]here are dramatically more opportunities for deadly violence in the domestic setting than in the intrusion setting." Thomas, 673 N.E.2d at 1347 (Pfeifer, J., dissenting); see also Bobbitt, 415 So.2d at 726; Conner v. State, 361 So.2d 774, 776 (Fla. 4th DCA 1978).
While there may be more opportunities for violence in the domestic setting, no empirical data has been presented, either through expert testimony or studies, demonstrating any correlation between eliminating a duty to retreat from the home and an increase in incidents of domestic violence. In contrast, a duty to retreat from the home adversely affects victims of domestic violence by placing them at greater risk of death or great bodily harm. In addition, failing to inform the jurors that the defendant had no duty to retreat from the residence when attacked by a co-occupant may actually reinforce commonly held myths concerning domestic violence victims.
As Florida's Standard Jury Instructions on self-defense make clear, a defendant is entitled to resort to deadly force in self-defense only if that force is necessary to protect himself or herself from death or great bodily harm. See Hedges, 172 So.2d at 827; Pell, 97 Fla. at 665, 122 So. at 116; Danford, 53 Fla. at 13, 43 So. at 597; Fla. Std. Jury Instr. (Crim.), "Justifiable Use of Deadly Force," § 3.04(d), at 46-48. Furthermore, the jury is instructed in all caseseven those cases where the privilege of nonretreat instruction is given that:
The defendant cannot justify the use of force likely to cause death or great bodily harm unless [he][she] used every reasonable means within [his][her] power and consistent with [his][her] own safety to avoid the danger before resorting to that force.
Id. at 48; Hedges, 172 So.2d at 827. Thus, the availability of the nonretreat instruction does not "invite" violence.
Nonetheless, we conclude that Justice Overton's "middle ground" instruction, as set forth in his dissent in Bobbitt, 415 So.2d at 728, satisfies any concern that eliminating a duty to retreat might invite violence. This instruction imposes a limited duty to retreat within the residence to the extent reasonably possible, but no duty to flee the residence. Accordingly, we adopt the following instruction:[15]

*1057 If the defendant was attacked in [his/ her] own home, or on [his/her] own premises, by a co-occupant [or any other person lawfully on the premises] [he/ she] had a duty to retreat to the extent reasonably possible without increasing [his/her] own danger of death or great bodily harm. However, the defendant was not required to flee [his/her] home and had the lawful right to stand [his/ her] ground and meet force with force even to the extent of using force likely to cause death or great bodily harm if it was necessary to prevent death or great bodily harm to [himself/herself].
See id.; see also Rippie v. State, 404 So.2d 160, 162 (Fla. 2d DCA 1981), quashed 419 So.2d 1087 (Fla.1982).
It is our increased knowledge of the complexities of domestic violence that provides the impetus for reconsidering our decision in Bobbitt. However, in deciding whether the privilege of nonretreat instruction is available we consider it inappropriate to distinguish between victims of domestic violence and other defendants who have been attacked by a co-occupant in the residence. This was the position espoused in Justice Overton's dissent. See Bobbitt, 415 So.2d at 728.
As Justice Kogan stated in his concurring opinion in Perkins v. State, 576 So.2d 1310, 1314 (Fla.1991), "[t]he right to fend off an unprovoked and deadly attack is nothing less than the right to life itself, which [article I, section 2] of our Constitution declares to be a basic right." Thus, the privilege of nonretreat instruction should be equally available to all those lawfully residing in the premises, provided, of course, that the use of deadly force was necessary to prevent death or great bodily harm.[16] Because this instruction will apply to both invitees and co-occupants alike, we recede from Hedges to the extent that Hedges does not require a middle-ground instruction for invitees.

V. EXCLUSION OF DEFENSE WITNESSES
Because we have jurisdiction to answer the certified question, we have jurisdiction to review other alleged errors raised in the appellate court. See Leisure Resorts, Inc. v. Frank J. Rooney, Inc., 654 So.2d 911, 912 (Fla.1995). Therefore, we also write to address the Second District's analysis of the exclusion of three defense witnesses.
We first emphasize that expert testimony about domestic violence, as authorized by Hickson, does not replace the value of eyewitness testimony to corroborate the claim of prior acts of abuse. We approved the admission of battered spouse syndrome testimony in Hickson as an aid to the jury in understanding the characteristics of victims of domestic violence and to help dispel common myths and stereotypes associated with them. See 630 So.2d at 174. However, expert testimony on battered spouse syndrome, even when it contains details of alleged incidents of abuse that have been related by the defendant to the expert, does not replace the importance of eyewitness testimony to corroborate the defense.
As the Second District correctly acknowledged, the trial court improperly excluded three defense witnesses, all of whom would have provided eyewitness testimony to corroborate Weiand's assertion of prior acts of abuse by her husband. See Weiand, 701 So.2d at 564-65. None of the other witnesses who testified at trial gave eyewitness testimony of Weiand's abuse by her husband. Thus, the excluded witnesses would have provided the only direct testimony to support Weiand's claims of *1058 prior abuse and to corroborate the basis for the experts' opinions.
Nonetheless, the Second District found that the exclusion of the witnesses was harmless error in light of the testimony of the defendant herself, that of the two experts who explained the battered-spouse syndrome from which defendant suffered, and the history of abuse in the relationship. Id. at 564. We disagree.
By excluding the witnesses in this case, the trial court deprived the defendant of eyewitness testimony. Furthermore, the exclusion of the three witnesses to prior incidents of domestic violence enabled the prosecutor to discredit Weiand's claims of abuse by arguing that no one had ever witnessed any injuries on Weiand or seen evidence of her husband's abuse of her:
Nobody saw any injuries to [Kathy] then. Nobody saw anything.... And how do we know that she's not [a battered woman]? All we have to back her up is her own statements.... Nobody saw any injuries to her then. Nobody saw anything.... Co-workers didn't see injuries to her. Her mother-in-law didn't see injuries to her. Her father-in-law didn't see the injuries to her.... Nobody sees any injuries to her. Nobody, nobody, ever.
Thus, we find that the Second District erred by concluding that the exclusion of the witnesses was harmless beyond a reasonable doubt. See Weiand, 701 So.2d at 565.

VI. CONCLUSION
In conclusion, we hold that there is no duty to retreat from the residence before resorting to deadly force against a co-occupant or invitee if necessary to prevent death or great bodily harm, although there is a limited duty to retreat within the residence to the extent reasonably possible. Thus, we answer the certified question, as rephrased, in the negative, recede from Bobbitt, recede in part from Hedges, and adopt the middle-ground jury instruction proposed by Justice Overton in his dissent in Bobbitt.
This opinion and the instruction will be applicable in all future cases, and all cases that are pending on direct review, or not yet final. See State v. Gray, 654 So.2d 552, 554 (Fla.1995). This opinion will not, however, apply retroactively to convictions that have become final. See State v. Glenn, 558 So.2d 4, 6 (1990); see generally Witt v. State, 387 So.2d 922, 928-29 (Fla. 1980). The decision of the Second District is quashed.
It is so ordered.
HARDING, C.J., ANSTEAD, J., and OVERTON and KOGAN, Senior Justices, concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which SHAW, J., concurs.
WELLS, J., concurring in part and dissenting in part.
I concur in much of the majority opinion because I certainly recognize the devastating toll of domestic violence upon women. I applaud legislative and executive initiatives addressing this very real problem and the judicial labor being expended to implement those initiatives. I am concerned, however, about the potential for the majority's jury instruction to be read as sanctioning retaliatory violence in domestic disputes. Nevertheless, I would concur in adopting the instruction on an interim basis, subject to publication, request for comment, and consideration with a direct focus on the question of retaliatory violence.
I must, though, dissent as to jurisdiction in this case. The Florida Constitution confers jurisdiction in relevant part by providing that this Court "may review any decision of a district court of appeal that passes upon a question certified by it to be of great public importance." Art. V, § 3(b)(4), Fla. Const. (emphasis added). It is patent that the district court did not *1059 pass upon the question certified in this case. In Gee v. Seidman & Seidman, 653 So.2d 384 (Fla.1995), we discharged jurisdiction in a case in which the Third District did exactly what the Second District did here. See also Provident Management Corporation v. City of Treasure Island, 718 So.2d 738 (Fla.1998), in which we declined to address issues that were "not first subjected to the crucible of the appellate process." Id. at 740. Clearly, the majority's reference to the generalized statement, "We have examined each [issue raised in the appeal] and conclude that none of the errors asserted require reversal," does not satisfy this constitutional requirement. This is patent upon reading the next sentence of the district court's opinion: "However, two of the issues raised do warrant discussion." The certified question was not one of those two issues. The Bobbitt issue appears nowhere in the opinion of the district court and only appears in a denial of rehearing which sets forth no issues but merely sets forth the certified question. This is exactly what this Court rejected in Gee as not meeting constitutional muster. The Constitution gives us no leeway to take this question unless we ignore its plain language. We cannot be selective and assume jurisdiction just because a majority finds it important to answer a question or simply wants to answer a question.
In this case, the district court passed upon neither the legal efficacy of the trial court's denial of the petitioner's requested jury instruction nor whether the jury instruction denied by the trial court would have applied to the facts of this case. Moreover, the majority opinion in this Court omits the facts of what occurred during the shooting. These omissions render the majority opinion an advisory opinion, for which we have no jurisdictional basis, rather than a review of issues decided by the district court.
The extraordinary lengths to which the majority has stretched to reach down for this case is plainly seen from the fact that not only was this issue not passed upon by the district court, but this case has been dismissed below. We will never know whether this jury instruction would even have been considered by the court below applicable to this case.
SHAW, J., concurs.
NOTES
[1] The State does not disagree that the petitioner raised this issue on appeal and that the issue was resolved against petitioner in the district court. Of course, the State urges us to adhere to our holding in State v. Bobbitt, 415 So.2d 724 (Fla.1982).
[2] We encourage the district courts, when certifying questions of great public importance, to provide this Court with the benefit of its analysis of the questions certified.
[3] The amicus curiae criticizes the use of the term "battered woman's syndrome," which is often used interchangeably with the term "battered spouse syndrome," arguing that the terms "do[] not fully capture all the material presented through expert testimony on domestic violence." Brief of Amicus Curiae at 7. We have used the terms in this opinion because the experts, including Dr. Lenore Walker, used them when testifying in this trial. We express no view on the criticism raised by the amicus curiae.
[4] Presently, however, a majority of jurisdictions do not impose a duty to retreat before a defendant may resort to deadly force when threatened with death or great bodily harm. See Wayne LaFave & Austin Scott, Jr., Criminal Law § 5.7(f) (2d ed.1986). There is no duty to retreat recognized when the defendant uses non-deadly force in self-defense. See id.; Morris v. State, 715 So.2d 1177, 1179 (Fla. 4th DCA 1998); Redondo v. State, 380 So.2d 1107, 1110 n. 1 (Fla. 3d DCA 1980), quashed in part on other grounds, 403 So.2d 954 (Fla. 1981); see also Fla. Std. Jury Instr. (Crim.), "Justifiable Use of Nondeadly Force," § 3.04(e), at 50.
[5] The "castle doctrine" has also been defined as including:

the proposition that a person's dwelling house is a castle of defense for himself and his family, and an assault on it with intent to injure him or any lawful inmate of it may justify the use of force as protection, and even deadly force if there exist reasonable and factual grounds to believe that unless so used, a felony would be committed.
Falco v. State, 407 So.2d 203, 208 (Fla.1981).
[6] Self defense. See Black's Law Dictionary 1357 (6th ed.1990).
[7] We note that in deciding Hedges v. State, 172 So.2d 824, 827 (Fla.1965), we cited for support the South Carolina Supreme Court's decision in South Carolina v. Grantham, 224 S.C. 41, 77 S.E.2d 291, 292 (1953). Grantham held that the trial court erred in refusing to instruct on the privilege of nonretreat where the defendant claimed self-defense when attacked by his wife in the marital home.
[8] At the time of our decision in Bobbitt, of those jurisdictions imposing a duty to retreat, only four states imposed a duty to retreat when attacked in the home by a co-occupant or invited guest. See Connecticut v. Shaw, 185 Conn. 372, 441 A.2d 561 (1981); Oney v. Kentucky, 225 Ky. 590, 9 S.W.2d 723 (1928); New Hampshire v. Grierson, 96 N.H. 36, 69 A.2d 851 (1949); West Virginia v. Crawford, 66 W.Va. 114, 66 S.E. 110 (1909). Since then, one more state has joined their ranks. See Rhode Island v. Ordway, 619 A.2d 819 (R.I.1992). Massachusetts, New Jersey and North Dakota have statutes imposing a duty to retreat when attacked in the home by someone with a legal right to be on the premises. See Mass. Gen. Laws ch. 278, § 8A (1998); N.J. Stat. Ann. § 2C:3-4b(2)(b)(i) (West 1998); N.D. Cent.Code § 12.1-05-07(2)(b) (1997). However, the New Jersey Supreme Court has expressed its strong disagreement with the statutorily imposed duty to retreat from the home, and has recently urged the New Jersey legislature to consider amending the statute. See New Jersey v. Gartland, 149 N.J. 456, 694 A.2d 564, 569-71 (1997).
[9] Of those jurisdictions imposing a duty to retreat before resorting to deadly force, eleven states have declined to find a duty to retreat from the residence when attacked by a co-occupant or invitee. See Baugh v. Alabama, 215 Ala. 619, 112 So. 157 (1927); Thomas v. Arkansas, 266 Ark. 162, 583 S.W.2d 32 (1979); Delaware v. Phillips, 187 A. 721 (Del.1936); Iowa v. Leeper, 199 Iowa 432, 200 N.W. 732 (1924); Maine v. Laverty, 495 A.2d 831 (Me.1985); Michigan v. Stallworth, 364 Mich. 528, 111 N.W.2d 742 (1961); New York v. Tomlins, 213 N.Y. 240, 107 N.E. 496 (1914); North Carolina v. Absher, 220 N.C. 126, 16 S.E.2d 656 (1941); Ohio v. Thomas, 77 Ohio St.3d 323, 673 N.E.2d 1339 (1997); Grantham, 77 S.E.2d at 291; Washington v. Allery, 101 Wash.2d 591, 682 P.2d 312 (1984). Similarly, the Model Penal Code, which recognizes a duty to retreat under most circumstances, does not impose a duty to retreat when necessary to defend against death or great bodily harm from a co-occupant of the dwelling. Model Penal Code § 3.04(2)(b)(ii)(A) commentary at 56 (1985).
[10] In the United States a woman is physically abused by her husband every nine seconds. See Executive Office of the Governor, The Governor's Task Force on Domestic and Sexual Violence, The Third Report at vii (hereinafter Third Report). According to one commentator, "even conservative estimates suggest that women are abused in twelve percent of marriages, and ... up to fifty percent of women will be victims of abuse during their lives." Joan H. Krause, Of Merciful Justice and Justified Mercy: Commuting the Sentences of Battered Women who Kill, 46 Fla. L.Rev. 699, 702 (1994).
[11] This public policy at the state level is reflected at the federal level. In 1994, President Clinton signed the Violence Against Women Act, which Attorney General Janet Reno has characterized as a "turning point in our national response to the problems of domestic violence and sexual assault, a mile-stone in the effort to break the cycle of violence." Executive Office of the Governor, The Governor's Task Force on Domestic and Sexual Violence, The Third Report at 61 (March 31, 1997). The Violence Against Women Act includes legislation appropriating over $285 million over a three year period to fund training programs and to help alleviate problems associated with domestic violence. See id. at 62. Other federal legislation is also directed at protecting victims of domestic violence. For example, federal law prohibits a person from crossing state lines to threaten, harass or commit bodily injury in violation of a domestic violence protection order, see 18 U.S.C.A. § 2262 (West Supp.1998), and it is now a federal crime to commit violence against an intimate partner in the pursuit of the partner across state lines. See id. § 2261. In addition, pursuant to 18 U.S.C.A. § 922 (West Supp.1998), it is unlawful for any person under a restraining order to transport, possess, or receive in interstate commerce any firearms or ammunition.
[12] Although stare decisis is fundamentally important in our system of justice, it is not "an ironclad and unwavering rule" so that we must bend to the "voice of the past, however outmoded or meaningless that voice may have become." Haag v. State, 591 So.2d 614, 618 (Fla.1992). The doctrine of stare decisis must bend when there has been a significant change in circumstances since the adoption of the legal rule. See Perez v. State, 620 So.2d 1256, 1259-61 (Fla.1993) (Overton, J., concurring). The changes in the public policy of this state, and our awareness of the plight of victims of domestic violence provides additional justification for receding from Bobbitt.
[13] "All fifty states have statutes making spousal abuse a crime." State v. Hickson, 630 So.2d 172, 174 (Fla.1994) (citing Rick Brown, Note, Limitations on Expert Testimony on the Battered Woman Syndrome in Homicide Cases: The Return of the Ultimate Issue Rule, 32 Ariz. L.Rev. 665 (1990)).
[14] See also, e.g., § 741.281, Fla. Stat. (1997); ch. 95-195, § 19, at 1781, Laws of Fla. (requiring a person convicted of committing a crime of domestic violence to attend a batterers' intervention program); § 741.2902(1), (2), Fla. Stat. (1997); ch. 91-210, § 5, at 2043-44, Laws of Fla. (expressing legislative intent regarding the judiciary's role to protect victims with respect to releasing defendants accused of domestic violence at the first appearance, as well as issuing domestic violence injunctions); § 415.604, Fla. Stat. (1997); ch. 84-353, § 4, at 1983-84, Laws of Fla. (requiring the Department of Children and Family Services to furnish a yearly report to the President of the Senate and the Speaker of the House on the status of domestic violence in the state); § 444.497, Fla. Stat. (1997); ch. 95-187, § 4, at 1731-32, Laws of Fla.; § 741.235, Fla. Stat. (1997).
[15] We sua sponte adopt this as an interim Standard Jury Instruction and instruct the Committee on Standard Jury Instructions in Criminal Cases to provide us with any recommendations as to the wording of the instruction by July 1, 1999.
[16] Most studies refer to victims of domestic violence as women because the overwhelming majority of the victims are women. However, because men can also be victims of domestic violence, our opinion applies to males and females alike. See Art. XI, § 5(c), Fla. Const.