[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14476
Non-Argument Calendar
_____

D.C. Docket No. 8:11-cv-01453-SDM-AEP


CHARLES L. TRICE,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 13, 2019)

Before JILL PRYOR, ANDERSON and HULL, Circuit Judges.

PER CURIAM:

Charles L. Trice, a Florida state prisoner, appeals the district court's denial of his 28 U.S.C. § 2254 federal habeas corpus petition challenging his convictions and total life sentence for first-degree murder, violation of a domestic violence injunction, and burglary with assault.  This Court granted a certificate of appealability ("COA") on one issue: whether the state post-conviction court unreasonably applied Griffith v. Kentucky, 479 U.S. 314, 107 S. Ct. 708 (1987), in determining that Trice's convictions were final when the Florida Supreme Court issued Weiand v. State, 732 So. 2d 1044 (Fla. 1999), and in failing to apply Weiand to his case.  After careful review, we affirm.

## I.  STATE TRIAL PROCEEDINGS

### A.    Murder and Trial Evidence

In 1994, a grand jury indicted Trice, who was a Florida Highway Patrol Trooper, on charges of first-degree murder, violation of a domestic violence injunction, and burglary with assault, all in connection with the killing of his estranged wife, Darla Trice.  At his jury trial, it was undisputed that Trice shot and killed Darla with his .357 revolver at their marital residence.  At trial, Trice testified, however, that he shot Darla in self-defense after she unexpectedly stabbed him in the chest with a knife and to prevent her from stabbing him again.  The state's evidence showed instead that Trice shot Darla because she wanted a divorce

2

and then stabbed himself to lay the ground work for a self-defense claim in order to get away with the murder.

As background, four months before the shooting, the couple separated, and Trice moved out of their marital home. Trice continued to have access to an office that was attached to the back of the home, which is where he kept his tools, weapons, and other supplies for work. The office had its own exterior door, so Trice could access the room without going through the main house. A domestic violence injunction prohibited Trice from entering the rest of the home but allowed him to access the office through the exterior door.[1] An interior door connected the office to the main house and could be locked from either side.

A week before the shooting, Trice was getting supplies at the Lakewood Florida Highway Patrol office when he made a remark about getting divorced and his wife trying to get everything. After using his co-worker Mary Roundtree's telephone, Trice looked Roundtree in the eye and said, "I ought to just go and kill her." Roundtree thought Trice was serious when he said that and discussed his statement with her family that night. Roundtree, however, did not otherwise report it until after the shooting.

---

[1]According to Darla's petition for a temporary injunction, on December 8, 1993, Trice grabbed her hair, pulled her arm behind her, and threw her against the wall in their home. Trice told Darla to leave the house and not take their daughter or else she would leave in a body bag. Trice then got his service revolver and the .357 revolver and went into the bedroom. Darla called a neighbor for help and fled the house. This incident led to the domestic violence injunction.

3

On the day of the shooting, April 24, 1994, Trice visited their marital house twice. On the first visit, he dropped off the couple's three-year-old daughter, which was customary. Trice returned to the home a second time 30 or 45 minutes later. At trial, it was disputed whether Trice entered the home through the garage door, in violation of the domestic violence injunction, or whether he entered through the exterior office door. Either way, while in his office, Trice and Darla began arguing about the couple's Corvette, which had been a source of several altercations between the two.

At some point during the argument, Trice shot Darla. The evidence showed that Trice's gun was three to 18 inches from Darla's chest when Trice fired it. The bullet traveled through Darla's body on a slightly downward path of about five degrees and, assuming she was standing when shot, Trice held the gun at a slightly downward angle when he fired.

Thereafter, two phone calls were made to 911 from the Trice home, four minutes apart. During the first call, the 911 dispatcher asked about the nature of the emergency but hung up when no one responded. The issue of who made the first call was disputed at trial, whether it was Trice or Darla. Trice made the second call, reporting to the 911 dispatcher that he shot Darla after she stabbed him with a knife.

4

According to Trice's version of the events, after he told Darla that he was not going to give her back the Corvette, she walked away. Trice then went into the office closet to get some supplies for work. While looking in the closet, Trice heard something behind him, turned around, and Darla stabbed him with a knife in the chest. His legs got weak and he dropped to his knees on the closet floor. Darla was standing at the edge of the doorway, yelling and screaming at him. Darla said that she should have killed him a long time ago. Trice turned to stand up and saw his handgun on the closet shelf. He grabbed the gun to scare Darla, but she came at him again, and he had no choice but to shoot her.

When the first officer arrived on the scene, Trice told him that Darla had stabbed him and that he had to shoot her. The officer noticed a small blood stain on Trice's t-shirt near his left shoulder. Trice led the officer to his office where Darla was lying face up near the closet, bleeding from the gunshot wound. Darla's left arm was extended towards a telephone and the receiver was off the hook. An emergency medical personnel who arrived in the office hung up the telephone and started to treat Darla, but she died a few minutes later. Investigators also found a small paring knife within an inch of Darla's left hand. While the knife had Darla's blood on it, investigators found no fingerprints or any of Trice's blood on it.[2]

---

[2]The state presented evidence that the paring knife was part of a set of knives found in a knife block in the Trices' kitchen. The paring knife was much smaller than all the other knives

5

Trice was taken to the hospital and treated for his stab wound. He had a one centimeter wound in his upper left chest that was about four centimeters deep in a downward inward tract. The knife did not penetrate his chest cavity and medical personnel closed the wound with one stitch. The treating doctor could not tell if Trice's wound was self-inflicted or inflicted by someone else.

Sergeant Ken Lane, a Florida Highway Patrol Trooper, visited Trice in the hospital. Lane worked as a homicide investigator and investigated motor vehicle traffic homicides. He met Trice in 1986 and they were friends.

At trial, Lane testified that, while in the hospital, Trice recounted the incident to him. Trice said that he had gone to the house to drop off his daughter and went into the office to look for some supplies. There, Trice and Darla had an argument and she stabbed him. Trice fell to his knees and Darla was standing over him. When she came at him again, he shot her with his firearm. Trice then dropped his gun and stayed against the wall trying to reorganize his thoughts until he heard his daughter running down the hallway. He met her at the office door and took her to the other side of the house. After that, Trice called 911.

The next day, Lane drove Trice from the hospital to the residence. Lane was not investigating the shooting at the time but accompanied Trice through the house.

---

in the set. During closing arguments, the state asked the jury why Darla would try to kill Trice with such a small paring knife, rather than with one of the bigger knives.

The two went into the office where Darla's blood was still on the floor. Trice was nonchalant and said, "Boy, she really made a mess in here, didn't she?" Trice also asked Lane how to clean up the blood. At trial, Trice denied making that statement or asking about cleaning the blood.

While in the office, Trice again detailed to Lane what had happened. After hearing Trice's explanation, Lane told him his story was not supported by the blood splatter and the body tissue residue in the room or the bullet's trajectory. For instance, if Trice shot Darla from the closet, why wasn't there any body tissue or blood splatter near the closet? Lane also asked why the bullet did not go straight through Darla into the office wall behind her, instead of striking a window six feet to the left of her body. Trice answered that the bullet might have struck Darla's spine and deflected to the left, but the autopsy showed the bullet went straight through her. Lane admitted, though, that he was not an expert in bloodstain analysis or ballistics. Lane told Trice again that he did not believe his story was lining up with the physical evidence and noted that, based on marks in the carpet, the office furniture appeared to have been moved.

Later, as they were going through the house, Lane asked Trice if the knife wound was self-inflicted because the situation was starting to look consistent with something he had read about before. Trice responded that he did not have the pain tolerance to stab himself. Lane testified that, as the investigation progressed, two

7

aspects of Trice's story changed from the version he originally told—that he made two trips to the house on the day of the incident and that he made two calls to 911.

At trial, the state's firearm expert also testified that the physical evidence did not match up with Trice's version of the events. Specifically, the firearm expert was asked hypothetically, based on (1) the entrance and exit wounds found on Darla, (2) the stippling pattern on Darla's skin surrounding the wound, and (3) the fact that the bullet did not deflect while traveling through her body, whether it was possible for the shooter to have been on his knees and to have fired the shot into a person standing up. The expert responded that this was not possible. However, on cross-examination, the firearm expert agreed that the stippling pattern found on Darla's skin could be consistent with the shooter being on his way up from his knees, if Darla was also bending over when shot.

## B.    Castle Doctrine Jury Instruction

Maintaining that he acted in self-defense, Trice persisted in his explanation throughout the trial. As relevant to this appeal, Trice requested a jury instruction on self-defense, including the following instruction, which is commonly referred to as the "castle doctrine" or the privilege of non-retreat from the home. Under Florida law, as an exception to the duty-to-retreat rule, the castle doctrine provides that a defendant has no duty to retreat when attacked in his home:

> If the defendant was attacked in his own home or on his own premises, he had no duty to retreat and had the lawful right to stand

8

his ground and meet force with force, even to the extent of using force likely to cause death or great bodily harm, if it was necessary to prevent death or great bodily harm to himself.

Although Trice was not residing in the marital home at the time, he contended that he had a superior legal right to his office, where the shooting occurred, and thus the instruction was proper.

The state trial court refused to give the castle doctrine instruction because both Trice and Darla had the legal right to occupy the office at the time of the shooting.  In so ruling, the state trial court relied on State v. Bobbitt, 415 So. 2d 724, 724-26 (Fla. 1982), in which the Florida Supreme Court held that when an assailant and the victim are legal occupants of the same home and neither has the legal right to eject the other, the "castle doctrine" does not apply.  Instead, the state trial court gave the instruction applicable in all self-defense cases regarding the duty to retreat:

> The fact that the defendant was wrongfully attacked cannot justify his use of force likely to cause death or great bodily harm if by retreating he could've avoided the need to use that force.

> However, if the defendant was placed in a position of imminent danger of death or great bodily harm, and it would've increased his own danger to retreat . . . then his own use of force [that] was likely to cause death or great bodily harm was justifiable.

## C.    Verdict and Sentence

On June 27, 1995, after hearing testimony from more than 40 witnesses over the course of six days, the jury found Trice guilty on all counts.  The state trial

9

court sentenced Trice to life imprisonment for first-degree murder, time served for violating the domestic violence injunction, and a consecutive life sentence for burglary with assault.

**D.    Direct Appeal**

On direct appeal, Trice raised several issues of trial error, but did not challenge the state trial court's exclusion of the castle doctrine instruction.  The Florida Second District Court of Appeal ("Second DCA") affirmed Trice's convictions and sentences and the Florida Supreme Court denied review.  See Trice v. State, 719 So. 2d 17 (Fla. Dist. Ct. App. 1998); Trice v. State, 729 So. 2d 396 (Fla. 1999) (table).  Trice's petition for a writ of certiorari with the U.S. Supreme Court was denied on June 24, 1999.  Trice v. Florida, 527 U.S. 1043, 119 S. Ct. 2410 (1999).

**E.    1999 Weiand Modifies 1982 Bobbitt Rule**

Meanwhile, on March 11, 1999, the Florida Supreme Court issued its decision in Weiand v. State, which resulted in a substantive change in Florida law regarding the castle doctrine.  732 So. 2d 1044 (Fla. 1999).  In Weiand, the Florida Supreme Court considered whether the privilege of non-retreat from the home should apply where a defendant wife killed her co-occupant husband in self-defense, after being physically abused and threatened by him.  Id. at 1048.  There, the evidence showed that the wife suffered from "battered woman's syndrome"

and shot her husband during a violent argument, despite having apparent opportunities to leave their apartment that night instead.  Id. at 1048.

Expressly reconsidering its contrary rule in Bobbitt, the Florida Supreme Court held that "there is no duty to retreat from the residence before resorting to deadly force against a co-occupant or invitee if necessary to prevent death or great bodily harm, although there is a limited duty to retreat within the residence to the extent reasonably possible."  Id. at 1051-58.  The Florida Supreme Court noted that imposing a duty to retreat from the home may adversely impact victims of domestic violence, and its decision was an evolution of the common law consistent with the evolution of Florida's public policy.  Id. at 1053-55.

In its decision, the Florida Supreme Court also adopted an interim standard jury instruction for its new rule:

> If the defendant was attacked in [his/her] own home, or on [his/her] own premises, by a co-occupant [or any other person lawfully on the premises] [he/she] had a duty to retreat to the extent reasonably possible without increasing [his/her] own danger of death or great bodily harm.  However, the defendant was not required to flee [his/her] home and had the lawful right to stand [his/her] ground and meet force with force even to the extent of using force likely to cause death or great bodily harm if it was necessary to prevent death or great bodily harm to [himself/herself].

Id. at 1057.  It explained that where the non-retreat instruction is applicable, the trial court's jury instructions are incomplete and misleading if the new instruction is not given.  Id. at 1056.  Lastly, the Florida Supreme Court directed that its

11

opinion and jury instruction was applicable to all future cases and all cases that were then pending on direct review or not yet final, but was not retroactively applicable to convictions that already were final. Id.

## II.  STATE POST-CONVICTION PROCEEDINGS

### A.    Rule 3.850 Motion and Appeal

In 2001, Trice filed a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850.  Among other things, Trice argued that after the date of his verdict, the Florida Supreme Court revised the castle doctrine in Weiand, such that he had no duty to retreat after being stabbed by co-occupant Darla.  Trice contended that the trial court's jury instruction was thus erroneous under the current state of the law, which deprived him of federal due process under the Constitution.  The state post-conviction court summarily denied this claim, concluding that Trice was not entitled to relief under Weiand because his case already was final when the Florida Supreme Court issued that decision.

Trice appealed, arguing that his case was not final when Weiand was issued. Rather, his conviction became final only on June 24, 1999, when the U.S. Supreme Court denied his petition for a writ of certiorari, and was therefore still pending on March 11, 1999, when the Florida Supreme Court decided Weiand.  Accordingly, Trice contended that the rule announced in Weiand, that he had no duty to retreat, applied to him and he should be retried with the appropriate jury instructions.

12

In response, the state conceded Trice's convictions were not final prior to the issuance of Weiand. However, it argued that Trice was not entitled to benefit from the modified jury instruction proposed by Weiand because the issue was not preserved by a contemporaneous objection at trial, and Trice's trial counsel could not be ineffective for failing to anticipate a change in the law. The Second DCA affirmed without a written opinion and denied rehearing.

### III. FEDERAL HABEAS PROCEEDINGS

Thereafter, in June 2011, Trice filed a counseled § 2254 petition raising several claims, including that the state post-conviction court improperly denied his request to apply Weiand to his case because it erroneously concluded that his case was final when the decision issued. Trice maintained that the substantial change in Florida law regarding the duty to retreat should apply to his case. As such, Trice argued that the state court's denial of this claim violated his federal due process and equal protection rights and was contrary to well-established federal law as determined by the U.S. Supreme Court. As to the latter point, Trice contended that the state court's denial of this claim was contrary to Griffith v. Kentucky, 479 U.S. at 322-23, 328, 107 S. Ct. at 713, 716, in which the Supreme Court held that newly declared constitutional rules of criminal procedure must apply retroactively to all criminal cases pending on direct review in state or federal courts.

13

The district court denied Trice's § 2254 petition.  In relevant part, the district court concluded that, although Trice's case was not final when Weiand was issued, Weiand's privilege of non-retreat was inapplicable to him because he was no longer a co-occupant of the residence with Darla at the time of the shooting. Rather, Trice had been barred from the home by a domestic violence injunction that prohibited him from entering the residence, except through the exterior door into the office.  Because, as the jury found, Trice violated the domestic violence injunction when he entered the house, the district court concluded that Trice was a trespasser in the residence, not a co-occupant.  The district court concluded, therefore, that any reliance on Weiand by Trice as a co-occupant would necessarily fail.  Finally, the district court noted that because Trice neither objected based on Weiand at trial, nor raised the issue on direct appeal, he could not benefit from the change in law.

Trice appealed.  This Court granted a COA as to whether the state post-conviction court unreasonably applied Griffith v. Kentucky in determining that Trice's case was final when the Florida Supreme Court issued Weiand and in failing to apply Weiand to his case.

14

## IV.  DISCUSSION[3]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

provides that, after a state court has adjudicated a claim on the merits, a federal

court may grant habeas relief only if the state court's decision was (1) "contrary to,

or involved an unreasonable application of, clearly established [f]ederal law, as

determined by the Supreme Court," or (2) "based on an unreasonable

determination of the facts in light of the evidence presented in the [s]tate court

proceeding."  28 U.S.C. § 2254(d)(1), (2).

The decision of a state court is "contrary to" federal law only if it

"contradicts the United States Supreme Court on a settled question of law or holds

differently than did that Court on a set of materially indistinguishable facts."

Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1355 (11th Cir. 2009)

(internal quotation marks and citations omitted).  A federal court making an

"unreasonable application" inquiry should ask whether the state court's application

of clearly established federal law was objectively unreasonable.  Bell v. Cone, 535

U.S. 685, 694, 122 S. Ct. 1843, 1850 (2002).

Because the Florida Second DCA did not explain its reasons for affirming

the denial of Trice's post-conviction motion, we must "look through" its decision

---

[3]We review a district court's denial of a § 2254 petition de novo.  Bester v. Warden, 836 F.3d 1331, 1336 (11th Cir. 2016).  In an appeal brought by an unsuccessful habeas petitioner, the scope of our review is limited to the issues specified in the COA.  Murray v. United States, 145 F.3d 1249, 1251 (11th Cir. 1998).

and presume that it adopted the reasoning of the state trial court, "the last related state-court decision that . . . provide[s] a relevant rationale." See Wilson v. Sellers, 584 U.S. __, __, 138 S. Ct. 1188, 1192 (2018) (explaining that, in the § 2254 context, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning"). The state may rebut this presumption by showing that the unexplained affirmance relied on or most likely relied on different grounds, such as alternative grounds for affirmance that were briefed or argued to the appellate court or were obvious in the record. Id.

The AEDPA imposes a "highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks and citation omitted). Moreover, federal habeas relief is not available for errors of state law. Jamerson v. Sec'y for Dep't of Corr., 410 F.3d 682, 688 (11th Cir. 2005). And because state courts are the ultimate expositors of state law, federal habeas courts are bound by state-court determinations on state-law questions. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Mullaney v.

16

Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 1886 (1975) ("This Court . . . repeatedly has held that state courts are the ultimate expositors of state law, and that we are bound by their constructions except in extreme circumstances[.]") (citation omitted).

## A.    Application of Griffith v. Kentucky

On appeal, Trice argues that he is entitled to federal habeas relief because the state post-conviction court unreasonably applied Griffith in failing to retroactively apply to his case the change in law announced in Weiand.  Based on Weiand, Trice argues that he is entitled to a new trial where the jury should be properly instructed that, for his self-defense claim, he had no duty to retreat from his home.  We are not persuaded.

In Griffith, the Supreme Court announced that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final."  Griffith, 479 U.S. at 328, 107 S. Ct. at 708.  A reading of that sentence alone would seem to indicate that Trice does have a claim for federal habeas relief.  However, there is an explicit limitation to Griffith's holding—it only applies to new federal constitutional rules.

Specifically, Griffith was concerned with whether Batson v. Kentucky, 476 U.S. 79, 106, S. Ct. 1712 (1986), should apply to "litigation pending on direct state or federal review or not yet final when Batson was decided."  Griffith, 479 U.S. at

17

316, 107 S. Ct. at 709. Thus, it dealt with a change to constitutionally mandated procedures, not a change to state substantive law. In fact, the Court ultimately held that the "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." Id. at 322, 107 S. Ct. at 713 (emphasis added).

We therefore conclude that, while Griffith requires retroactive application of new constitutional rules of criminal procedure to cases pending on direct appeal, it does not require retroactive application of new state substantive law to non-final state convictions. See id. And in Weiand, the Florida Supreme Court only announced a change in state criminal law—broadening the castle doctrine defense under Florida law. Weiand, 732 So. 2d at 1048. Because Griffith does not extend to such state law changes, the case has no application here.

Instead, the legal basis for Trice's contention that Weiand applied to his case rests entirely on Florida law. The Florida Supreme Court, persuaded by the principles underlying Griffith, has held that its decision that announcing a new rule of state law in criminal cases must be given retroactive application by Florida courts in every case pending on direct review or not yet final, provided the defendant timely objected at trial to preserve the issue for appellate review. Smith v. State, 598 So. 2d 1063, 1066 (Fla. 1992). This holding, however, was based solely on the Florida constitution, not federal law and not Griffith. Id. at 1066 n.4

18

("Although we cite to some federal decisions, we explicitly decide this case on state constitutional grounds.").  Consistent with <u>Smith</u>, the <u>Weiand</u> decision itself directs that it should apply to all other non-final Florida cases and does so without citing to any federal law.  See <u>Weiand</u>, 732 So. 2d at 1058.

Because the retroactive application of <u>Weiand</u> is controlled entirely by Florida state law, not <u>Griffith</u>, we conclude that Trice's contention that the state post-conviction court unreasonably applied <u>Griffith</u> in denying his claim is meritless.  The state court could not have unreasonably applied <u>Griffith</u> because that case is simply not applicable.

## B.    Federal Habeas Relief Based on State Law Error

Nevertheless, as the state concedes on appeal, the state post-conviction court's rejection of Trice's claim on the ground that his convictions already had become final at the time that <u>Weiand</u> issued was an incorrect application of state law.  Under Florida law, Trice's convictions were not final when <u>Weiand</u> was decided because his petition for a writ of <u>certiorari</u> to the U.S. Supreme Court was still pending.  See <u>Huff v. State</u>, 569 So. 2d 1247, 1250 (Fla. 1990) (explaining that if the defendant files a petition for writ of <u>certiorari</u> with the U.S. Supreme Court, his conviction and sentence do not become final until the writ is determined for purposes of Rule 3.850).  The question we must answer then is whether Trice is

19

entitled to federal habeas relief based on this state law error. We conclude that he is not.

As an initial matter, since it was obvious that the state post-conviction court's reason for denying this claim was wrong, the state argues on appeal that the Second DCA most likely relied on different alternative grounds in affirming the court's decision. See Wilson, 138 S. Ct. at 1192, 1196 ("[T]he unreasonableness of the lower court's decision itself provides some evidence that makes it less likely the state [appellate] court adopted the same reasoning."). We agree.

The record shows that the state expressly conceded in its briefing to the Second DCA that Trice's convictions were not yet final when Weiand was decided and, therefore, the state post-conviction court's reasoning was faulty. Nonetheless, the state argued that Trice was not entitled to benefit from the change of law announced in Weiand because he did not preserve the issue by making a timely objection at trial. Under Florida law, to benefit from a recent change in law, a defendant must have preserved the issue for appeal by timely objecting at trial. Smith, 598 So. 2d at 1066.

Here, while Trice requested the castle doctrine jury instruction at trial, he specifically argued that the instruction was proper because Darla was not permitted in his office and, thus, he was the sole occupant. He did not argue that Darla was a co-occupant of the office or that the castle doctrine should apply to co-occupants.

20

In any event, Trice also did not raise any challenge to the state trial court's

self-defense instruction on direct appeal.  Accordingly, it was reasonable for the

Second DCA to determine that Trice could not benefit from Weiand's change of

law because he did not adequately preserve the issue.  See Steinhorst v. State, 412

So. 2d 332, 338 (Fla. 1982) ("[I]n order for an argument to be cognizable on

appeal, it must be the specific contention asserted as legal ground for the objection,

exception, or motion below [in the trial court]."); Reynolds v. State, 934 So. 2d

1128, 1140 (Fla. 2006) (same).  We are bound by state-court determinations on

state-law questions.  See Estelle, 502 U.S. at 67-68, 112 S. Ct. at 480; Mullaney,

421 U.S. at 691, 95 S. Ct. at 1886.

Moreover, the crux of Trice's Weiand claim on appeal is that the state trial

court's jury instructions were erroneous under Florida law because the court failed

to instruct the jury that he had no duty to retreat from his home.  But the fact that a

jury instruction "was allegedly incorrect under state law is not a basis for habeas

relief" because federal habeas review "is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States."  See Estelle, 502

U.S. at 68, 71-72, 112 S. Ct. at 480-82.  The only question we may address is

"whether the ailing instruction itself so infected the entire trial that the resulting

conviction violates due process."  Id. at 72, 112 S. Ct. at 482.  In making that

determination, the jury instruction "'may not be judged in artificial isolation,' but

21

must be considered in the context of the instructions as a whole and the trial record." Id.

Significantly, on appeal, Trice does not make any argument as to that question. He does not argue at all that the allegedly erroneous jury instruction infected his trial in violation of due process. As a result, Trice has abandoned the issue and waived his right to have us consider it. See United States v. Willis, 649 F.3d 1248, 1254 (11th Cir. 2011) ("A party seeking to raise a claim or issue on appeal must plainly and prominently so indicate . . . . Where a party fails to abide by this simple requirement, he has waived his right to have the court consider that argument.") (internal quotation marks and citation omitted); San Martin v. McNeil, 633 F.3d 1257, 1268 n.9 (11th Cir. 2011) (same). Without a federal due process dimension, Trice's claim that the jury instructions were erroneous is not a basis for federal habeas relief.

## C.    Due Process Violation

Even if Trice did not waive this issue, we are also not persuaded that the state trial court's jury instruction "itself so infected the entire trial that the resulting conviction violates due process." See Estelle, 502 U.S. at 72, 112 S. Ct. at 482. First, it is not entirely clear that Trice would benefit from Weiand's jury instruction based on the castle doctrine because he was not a co-occupant of the residence with Darla at the time of the shooting. Rather, he had moved out of the house and

was in fact barred from entering the main house at all by a domestic violence injunction.

However, assuming without deciding that Trice and Darla were co-occupants of the office at the time of the shooting, we still conclude that the trial court's jury instructions did not "so infuse[] the trial with unfairness as to deny due process of the law." See Estelle, 502 U.S. at 75, 112 S. Ct. at 484. The jury was instructed at trial that, for his self-defense claim, Trice had a duty to retreat before resorting to deadly force, but if Trice was in a position of imminent danger of death or great bodily harm and retreating would increase his own danger, then his use of force was justifiable.

Under Trice's own version of the events though, there was no place for him to physically retreat to without having to go through Darla who was attacking him with a knife and trying to kill him. Trice testified and maintained throughout the entire proceeding that Darla stabbed him while he was in the office closet. He fell to his knees on the closet floor, grabbed his gun from a shelf, and shot Darla in self-defense because she was coming at him again with the knife. The evidence showed that Darla was within three to 18 inches of Trice when he fired the gun and Trice testified that he had no choice but to shoot her to prevent her from stabbing him again. If the jury believed Trice's testimony, then he was not harmed by the jury instruction given because it was impossible for him to retreat at all from

23

within the closet, let alone retreat from the home, and thus his use of force was justifiable.

Additionally, both the self-defense instruction given by the state trial court and the new instruction set forth in Weiand impose a reasonable duty to retreat. Namely, the Weiand instruction would have provided Trice "had the duty to retreat to the extent reasonably possible without increasing [his] own danger of death or great bodily harm." Weiand, 732 So. 2d at 1057. Likewise, under the trial court's instruction given, Trice's use of force was justified if he was in a position of imminent danger of death or great bodily harm and retreating would increase his own danger. Although worded somewhat differently, these two instructions are consistent insofar as, under both versions, Trice had a duty to retreat unless doing so increased his own danger of imminent death or great bodily harm. To the extent that the jury believed that Darla attacked Trice, but Trice could have reasonably maneuvered around her without increasing his own danger of death or great bodily harm, Trice was not harmed by the instruction given because the jury would have concluded that his use of force was not justifiable under both versions of the instruction.

The main difference between the trial court's self-defense instructions and the Weiand instruction is that, under Weiand, the trial court would have expressly instructed that Trice had no duty to retreat from the home. Id. However, we

conclude that this omission from Trice's trial did not infuse it with unfairness because, according to Trice's testimony, there were no apparent opportunities for him to retreat from the residence during the altercation. Indeed, this case is not like Weiand, where the defendant wife had several opportunities during a violent argument to leave the couple's apartment before shooting her husband. Id. at 1048. Nor was Trice's duty to retreat a feature at his trial, like it was in Weiand, where the prosecutor capitalized on the jury instruction to ask the jury why the defendant wife did not "go out the door?" or "get in the car?" before resorting to violence. Id. at 1054. Rather, here, the state wholesale rejected Trice's story, arguing instead that Trice stabbed himself after he shot Darla in order to manufacture a self-defense claim.

Under these particular factual circumstances, we conclude that even if the trial court's self-defense jury instructions were erroneous under state law, Trice is not entitled to federal habeas relief because the instructions given did not deprive him of due process. See Estelle, 502 U.S. at 72, 112 S. Ct. at 482 ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right]." (internal quotation marks omitted)).

## V.  CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Trice's

§ 2254 petition.[4]

**AFFIRMED.**

---

[4]Because we affirm the district court's denial of Trice's § 2254 petition for the reasons given, we do not address Trice's arguments on appeal regarding the correctness of the district court's alternative findings that he "entered the residence through the garage" and was thus a trespasser under Florida law.